EFiled: Jul 24 2014 12:10PM EDT
Transaction ID 55779872
Case No. 8526-VCN

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE EBIX, INC.           :     **CONSOLIDATED**
STOCKHOLDER LITIGATION     :     **C.A. No. 8526-VCN**

### MEMORANDUM OPINION

Date Submitted: February 20, 2014
Date Decided: July 24, 2014

Michael Hanrahan, Esquire, Paul A. Fioravanti, Jr., Esquire, Kevin H. Davenport, Esquire, and Eric J. Juray, Esquire of Prickett, Jones & Elliott, P.A., Wilmington, Delaware; Stuart M. Grant, Esquire, Michael J. Barry, Esquire, and Bernard C. Devieux, Esquire of Grant & Eisenhofer P.A., Wilmington, Delaware; Seth D. Rigrodsky, Esquire, Brian D. Long, Esquire, and Gina M. Serra, Esquire of Rigrodsky & Long, P.A., Wilmington, Delaware; Christine S. Azar, Esquire and Peter C. Wood, Jr., Esquire of Labaton Sucharow LLP, Wilmington, Delaware; Mark Lebovitch, Esquire and Jeremy Friedman, Esquire of Bernstein Litowitz Berger & Grossmann LLP, New York, New York; Marc A. Topaz, Esquire, Lee D. Rudy, Esquire, Michael C. Wagner, Esquire, Justin O. Reliford, Esquire, and James H. Miller, Esquire of Kessler Topaz Meltzer & Check, LLP, Radnor, Pennsylvania; Jeffrey W. Golan, Esquire and Lisa M. Lamb, Esquire of Barrack, Rodos & Bacine, Philadelphia, Pennsylvania; Carl L. Stine, Esquire of Wolf Popper LLP, New York, New York; Kent A. Bronson, Esquire and Jessica Sleater, Esquire of Millberg LLP, New York, New York; and William B. Federman, Esquire of Federman & Sherwood, Oklahoma City, Oklahoma, Attorneys for Plaintiffs.

Samuel A. Nolen, Esquire, Catherine G. Dearlove, Esquire, and Christopher H. Lyons, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware; Charles W. Cox, Esquire and Kimberly K. Chemerinsky, Esquire of Alston & Bird LLP, Los Angeles, California; and John A. Jordak, Jr., Esquire of Alston & Bird LLP, Atlanta, Georgia, Attorneys for Defendants.

NOBLE, Vice Chancellor

This Court has, on occasion, heard claims asserted by a stockholder of a Delaware corporation challenging the board of directors' decision to agree to a recently-announced merger.[1] A stockholder plaintiff typically challenges that decision as a breach of the directors' fiduciary duties and often seeks to enjoin the merger's consummation—be it due to allegations of a flawed sale process, unreasonable provisions in the merger agreement, inadequate disclosures in the proxy materials, or some other theory. Sometimes stockholders are successful in this endeavor; sometimes they are not. Other times, business realities change, and the merger may be abandoned for reasons independent of any litigation in this Court. Stockholder plaintiffs in this last category are then left without a viable cause of action—or so it would seem. As this lawsuit demonstrates, however, terminating a merger agreement does not necessarily foreclose stockholder litigation that, absent the abandoned merger, may not otherwise have been pursued.

Defendant Ebix, Inc. ("Ebix") agreed to be acquired by an affiliate of Goldman, Sachs & Co. ("Goldman") in May 2013. In that going-private merger, the company's public stockholders were to receive $20.00 in cash per share, and several of its largest stockholders were to roll over a portion of their Ebix stock for equity in the post-merger entity. Defendant Robin Raina ("Raina"), Ebix's

---

[1] By one recent calculation, more than 90% of mergers involving publicly-traded companies during 2012 and 2013 were challenged in stockholder lawsuits. *See, e.g.*, Matthew D. Cain & Steven M. Davidoff, *Takeover Litigation in 2013*, at 2-3 (Jan. 9, 2014), http://ssrn.com/abstract=2377001.

1

Chairman and Chief Executive Officer ("CEO"), was in the second group of stockholders. He agreed to accept $32 million in cash and 29% of the post-merger entity in exchange for his fully diluted, 9.3% stake in Ebix and his agreeing to waive any bonus payment due to him from the company under his 2009 Acquisition Bonus Agreement (the "ABA"). By the end of the month, Ebix stockholders had filed twelve class actions in this Court challenging the terms of the proposed merger, including the consideration that Raina would receive. But, the course of the litigation changed in June when Ebix and Goldman terminated their agreement.

Left without a transaction to challenge, the Plaintiffs[2] filed the Amended Complaint, shifting their focus to the conduct surrounding the ABA. In the Amended Complaint, the Plaintiffs assert several class and derivative claims against Ebix and its board of directors (the "Board," and together with Ebix, the "Defendants"): (i) a declaratory judgment claim regarding certain terms of the ABA;[3] (ii) a direct breach of fiduciary duty claim regarding the adoption and effects of, and disclosures about, the ABA;[4] (iii) a direct breach of fiduciary duty claim challenging the company's 2010 Stock Incentive Plan as invalid because it

---

[2] The Co-Lead Plaintiffs are Desert States Employers & UFCW Union Pension Plan and Gilbert C. Spagnola. Verified Am. and Supplemented Class Action and Deriv. Compl. ("Am. Compl." or the "Amended Complaint") ¶¶ 12, 14.

[3] *Id.* ¶¶ 91-95.

[4] *Id.* ¶¶ 96-104.

was adopted pursuant to a materially uninformed stockholder vote;[5] and (iv) a derivative breach of fiduciary duty claim regarding the adoption and effects of, and disclosures about, the ABA.[6] The Plaintiffs have also asserted direct and derivative claims against Raina for breach of fiduciary duty and unjust enrichment for improperly retaining the rights he received under the ABA.[7]

The Defendants moved to dismiss all of the Plaintiffs' claims pursuant to Court of Chancery Rules 23.1 and 12(b)(6). In brief, the Defendants assert that the claims related to the ABA are either barred by laches or not ripe, that the claims asserted are all derivative and demand is not excused, and that the Amended Complaint otherwise fails to state a claim upon which relief may be granted.

For the reasons set forth below, the Court concludes that the Defendants' motion must be granted in part and denied in part.

## I. THE PARTIES

Ebix, a Delaware corporation based in Atlanta, Georgia, provides e-commerce, software and related services to the insurance industry. Its stock trades on the NASDAQ.[8] Including options, Raina and his eponymous foundation

---

[5] *Id.* ¶¶ 109-11.
[6] *Id.* ¶¶ 112-16.
[7] *Id.* ¶¶ 105-08, 117-20.
[8] *Id.* ¶ 15.

3

beneficially owned approximately 9.3% of Ebix's stock as of June 2013, making him the company's largest stockholder.[9]

The Board is comprised of six directors, each of whom is named as a Defendant in this action: Raina, Pavan Bhalla ("Bhalla"), Neil D. Eckert ("Eckert"), Rolf Herter ("Herter"),[10] Hans U. Benz ("Benz"), and Hans U. Keller ("Keller"). Each has served as a director since at least 2005.[11] Benz and Keller have constituted the Board's Compensation Committee since 2009.[12] At times, the Court refers to Bhalla, Eckert, Herter, Benz, and Keller as the "Outside Directors."

Raina has been Ebix's CEO since 1999 and Chairman of the Board since 2002.[13]

The Plaintiffs have been Ebix stockholders at all material times.[14]

## II. BACKGROUND

A. *Ebix's 1996 Stock Incentive Plan*

Undoubtedly like most large companies, Ebix has historically had an incentive-based compensation plan for its officers, directors, and employees. Ebix's 1996 Stock Incentive Plan, with the amendments thereto, (the "1996 Plan")

---

[9] *Id.* ¶¶ 16, 20.
[10] Herter is a director of the Rennes Fondation, Ebix's second-largest stockholder. In the proposed Goldman merger, the Rennes Fondation, like Raina, was to rollover a portion of its Ebix stock into equity in the post-merger entity. *Id.* ¶ 20.
[11] *Id.* ¶¶ 16-21.
[12] *Id.* ¶¶ 17, 21.
[13] *Id.* ¶ 16.
[14] *Id.* ¶¶ 12, 14.

governs the awarding of compensation such as options, stock appreciation rights, restricted shares, deferred shares, performance shares, and performance units.[15] One of the compensation units it authorizes is an Appreciation Right, through which a recipient would be entitled to up to 100% of the increase in the price of Ebix stock from the defined base price on the date the right is granted to the exercise price on the date the right is exercised.[16]

The 1996 Plan sets forth certain mandatory and permissive terms for Appreciation Rights. For example, while Appreciation Rights may be conditioned on a change-in-control transaction, they must be evidenced by an agreement stating that the grant is subject to all of the terms of the 1996 Plan.[17] In addition, a grant of an Appreciation Right "shall specify . . . a Base Price per Common Share, which shall be equal to or greater than the Market Value per Share on the Date of Grant."[18] The Date of Grant, in turn, is "the date specified by the Board on which a grant of . . . Appreciation Rights . . . shall become effective, which shall not be earlier than the date on which the Board takes action with respect thereto."[19]

---

[15] *Id.* ¶ 23.
[16] *Id.* ¶ 24.
[17] *Id.* ¶ 25. The written agreement "shall describe the subject Appreciation Rights, identify any related Option Rights, state that the Appreciation Rights are subject to all of the terms and conditions of this Plan and contain such other terms and provisions as the Board may determine consistent with this Plan." *Id.*
[18] *Id.*
[19] *Id.* ¶ 26.

The 1996 Plan also contains aggregate award limits. Only 1,137,500 shares are available under it, and a recipient may receive up to 125,000 shares annually.[20] The Board may not increase the aggregate number of available shares, but it may adjust certain terms of the awards, such as the base price of Appreciation Rights, to prevent dilution after a stock split, stock dividend, or similar change to the company's capital structure.[21]

Ebix filed the 1996 Plan with the Securities and Exchange Commission ("SEC") as an exhibit to its 2004 Form 10-K Annual Report (the "2004 Form 10-K").[22]

B. *The Acquisition Bonus Agreement between Ebix and Raina*

Based on a recommendation from the Compensation Committee, the Outside Directors unanimously authorized Ebix to enter into the ABA with Raina on July 15, 2009.[23] The ABA provided to Raina a right to a bonus payment upon a defined acquisition event. In a Form 8-K Current Report filed with the SEC on July 21 (the "July 2009 Form 8-K"), the Board disclosed the ABA and summarized the way in which Raina would be compensated under it:

---

[20] *Id.* ¶ 23.
[21] *Id.* ¶¶ 23, 28. The Board may also, in "good faith," adjust the aggregate award limits to reflect changes in Ebix's capital structure. *Id.* ¶ 28.
[22] *Id.* ¶ 23.
[23] *Id.* ¶ 29.

> Mr. Raina shall receive in cash an amount equal to 20% of the total outstanding shares of Ebix common stock, on a fully diluted basis, prior to the occurrence of such an event less the number of shares of common stock Mr. Raina beneficially owned at that time, multiplied by the difference between the per share fair value of the net proceeds received by the Company less $23.84.[24]

In effect, because Raina already held just under 10% of Ebix's fully diluted stock in July 2009, the ABA granted to him stock appreciation rights on approximately 10% more of the company's fully diluted stock.[25] The ABA further provided to Raina a gross-up payment, in order to cover any federal excise tax on change-in-control payments, on both the bonus amount and the gross-up itself.[26]

The ABA, according to the Plaintiffs, is subject to the 1996 Plan because it "granted Acquisition Rights within the meaning of the 1996 Plan" to Raina.[27] The Plaintiffs contend that the ABA violates the 1996 Plan in at least three primary ways: (i) "the Base Price exceeded [the] market value of [Ebix stock on] the Date of the Grant"; (ii) the awarding of approximately 1.1 million Appreciation Rights exceeded the 125,000 annual limit per recipient; and (iii) the ABA did not state that it was subject to the 1996 Plan.[28]

---

[24] *Id.* ¶ 34. Raina would also have to be an Ebix employee or have been involuntarily terminated without cause within the 180-day period preceding the acquisition event. *Id.* ¶ 36.
[25] *Id.* ¶ 39.
[26] *Id.* ¶ 42.
[27] *Id.* ¶ 44.
[28] *Id.*

The base price for Raina's rights (the "Base Price") under the ABA is perhaps the key issue in dispute in this litigation. Initially, the ABA defined the Base Price as $23.84.[29] That represented, as the Board would later disclose, the closing price of Ebix stock on March 25, 2009. The Plaintiffs contend that, for the ABA to comply with the 1996 Plan, the Base Price should have been at least the market price of Ebix stock on the date the ABA was executed—which was, they say, $37.32 on July 15, 2009.[30] As alleged, the Outside Directors "knew" that the $23.84 Base Price was not the market value of Ebix's stock on July 15 when they approved the ABA.[31]

Although a number of terms used to calculate Raina's rights under the ABA may fluctuate, the definition of the Base Price allegedly does not. Specifically, the Plaintiffs assert that the ABA "does not contain any anti-dilution provision for a change in the Base Price in the event of a stock split."[32] While they do recognize that Ebix and Raina may amend the ABA by written agreement, the Plaintiffs insist that the ABA—especially the Base Price—has not been amended.[33] The Defendants, when pressed on this issue, were unable to identify a written

---

[29] *Id.* ¶ 37.
[30] *Id.* ¶ 56.
[31] *Id.* ¶¶ 90, 98.
[32] *Id.* ¶¶ 40, 93
[33] *Id.* ¶¶ 41, 93.

amendment to the ABA that may have negated the Plaintiffs' claim as a matter of law.[34]

The July 2009 Form 8-K stated that the ABA was intended to create the right incentives for Raina "to profitably grow the Company" and to "maximize the value received by all stockholders of Ebix" in a change-in-control transaction.[35] The Board also suggested that the ABA was, in part, a response to its evaluation of "the potential threat of the Company itself being an acquisition target" because of its "comparatively low P/E [price/earnings] multiple."[36]

Although Ebix promptly disclosed the ABA in the July 2009 Form 8-K, the company did not mention the agreement in several of its subsequent SEC filings in 2009. For example, in the proxy statement for its October 2009 annual meeting (the "2009 Proxy Statement"), the Compensation Committee's report on executive compensation did not mention the ABA, despite discussing Raina's other bonus compensation that the Outside Directors had approved in March 2009.[37]

---

[34] Tr. of Oral Arg. Defs.' Mot. to Dismiss 87-88 ("The plaintiffs allege [the ABA] has not [been amended], and Your Honor would need to take that as a pled fact, as true for purposes of the motion to dismiss.").

[35] Am. Compl. ¶¶ 31, 33.

[36] *Id.* ¶ 32.

[37] *Id.* ¶¶ 47-48. Under its charter, the Compensation Committee must prepare a report on executive compensation to be included in the company's annual meeting proxy statements. The report is reviewed and approved by Ebix's CEO and Chief Financial Officer. *Id.* ¶ 47.

C. *Ebix's 3-for-1 Stock Split Via a Two-Share Stock Dividend*

In late 2009, Ebix sought to effect a 3-for-1 stock split by way of a two-share stock dividend. The company issued a proxy statement for a special stockholders' meeting (the "2009 Special Meeting Proxy Statement") to approve a charter amendment that would increase the number of authorized shares from 20 million to 60 million. The Board "did not mention the Acquisition Bonus Agreement or indicate that the stock dividend would reduce the Base Price under that Agreement" in the 2009 Special Meeting Proxy Statement.[38] Ebix stockholders approved the charter amendment, and Ebix issued the dividend.[39]

D. *The Discussion of the ABA in the 2009 Form 10-K*

The Defendants submit that the ABA was fully disclosed to stockholders in the company's 2009 Form 10-K Annual Report (the "2009 Form 10-K"), which Ebix filed with the SEC on March 16, 2010.[40] In the 2009 Form 10-K, the Board identified the "Spread" under the ABA as being "calculated by subtracting $23.84 (post three-for-one split, $7.95) from the Net proceeds per share."[41] The Board

---

[38] *Id.* ¶ 49.

[39] *Id.*

[40] The 2009 Form 10-K is extrinsic to the Amended Complaint. But, because the Plaintiffs' claims (and tolling arguments in response to the Defendants' laches defense) center on the Board's disclosures regarding the ABA, the Court will consider what this SEC filing disclosed. In doing so, the Court does not accept the truth of what was disclosed. *See Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996).

[41] Lyons Trans. Aff. Ex. 2 (Ebix, Inc. Annual Report (Form 10-K), at 77 (Mar. 16, 2010)).

The Court notes that this disputed adjustment to the Base Price after Ebix's two-share dividend would have maintained the same incentive structure for Raina.

also explained that $7.95 "represents the approximate price per share of the Company's common stock on March 25, 2009 when the independent members of the Board agreed on the desirability of this type of agreement."[42]  The July 15, 2009, date on which the ABA was executed was not discussed in the 2009 Form 10-K, but the date was noted in the exhibit list, which incorporated the ABA by reference.[43]

E. *The Board Seeks Stockholder Approval of the 2010 Stock Incentive Plan*

In the proxy statement for the company's 2010 annual meeting (the "2010 Proxy Statement"), the Board recommended that Ebix stockholders approve the proposed 2010 Stock Incentive Plan (the "2010 Plan").  The 2010 Plan would authorize up to five million additional shares in incentive-based compensation for Ebix officers, directors, and employees.  The Board described the 2010 Plan as "critical" and "essential" to Ebix's future, in part, because approximately 80% of the shares authorized by the company's prior incentive-based compensation plans—such as the 1996 Plan—had already been granted.[44]  The 2010 Plan, much like the 1996 Plan, provided anti-dilution protection by permitting certain

---

[42] *Id.* at 78.
[43] *Id.* at 91.
[44] Am. Compl. ¶ 50.

11

adjustments to the exercise price for stock options in the event of a stock dividend or a stock split.[45]

The Board again explained how Raina would be compensated under the ABA in the 2010 Proxy Statement. The Base Price was identified as $7.95.[46] This disclosure is the first of several in Ebix proxy statements that the Plaintiffs challenge as a material misstatement because the Base Price was allegedly never reduced, by operation of the ABA's terms or by a written amendment, from $23.84. Additionally, the Board described the Base Price as the price of Ebix stock on March 25, 2009, the date "when the independent members of the Board agreed on the desirability of this type of agreement."[47] Other than on the exhibits list, the 2010 Proxy Statement does not appear to disclose that the Outside Directors approved the ABA on July 15, 2009; it simply notes that the approval occurred "in 2009."[48]

Ebix stockholders presumably approved the 2010 Plan. Following Ebix's annual meetings in 2010, 2011, and 2012, the Outside Directors were granted 9,000 options each pursuant to the 2010 Plan. The total value of these awards was

---

[45] *Id.* ¶¶ 51, 65.
[46] *Id.* ¶¶ 55-56.
[47] *Id.* ¶ 56.
[48] *Id.* ¶ 54.

approximately $300,000.[49]  Raina also received 12,500 restricted shares, worth approximately $879,298, pursuant to the 2010 Plan in 2012.[50]

F.  *The Discussion of the ABA in Ebix's 2011 and 2012 Proxy Statements*

In the proxy statement for the company's 2011 annual meeting (the "2011 Proxy Statement"), the Board noted that the $7.95 Base Price was a post-stock dividend price.  The included Compensation Committee report stated that the Outside Directors approved the ABA in 2010 rather than in 2009.[51]  But, the following year, in the proxy statement for Ebix's 2012 annual meeting (the "2012 Proxy Statement"), the Compensation Committee report noted that the approval was in 2009.[52]

As it did in the July 2009 Form 8-K, the Board continued to describe the ABA as having, in part, anti-takeover effects.  For example, in the 2010, 2011, and 2012 Proxy Statements, the Board noted:

> Considering the continued healthy growth of the Company and the prevailing comparatively low price to earnings multiple of Ebix's common stock, the Board has evaluated the potential threat of the Company itself being an acquisition target.  The Agreement [*i.e.*, the ABA] serves in part to allow for stockholder value to be maximized by dissuading a potentially hostile attempt at an unacceptable price.[53]

---

[49] *Id.* ¶ 57.
[50] *Id.* ¶ 16.
[51] *Id.* ¶ 61.
[52] *Id.* ¶ 62.
[53] *Id.* ¶ 67.

The Board also described the ABA as intended to reward Raina for his contributions "to the future success and growth of Ebix."[54]

In the 2012 Proxy Statement, apparently for the first time, the Board provided a hypothetical calculation of Raina's payment rights under the ABA. The calculation assumed, as had been disclosed in the 2010, 2011, and 2012 Proxy Statements, that the Base Price was $7.95:

> Using the number of shares of common stock held by Mr. Raina on the record date for the Company's 2012 Annual Meeting, and, merely for sake of example, a $24.00 price of the Company's stock as the Net Proceeds, Mr. Raina would receive a $92,214,368 payment upon a liquidation event.[55]

Given Raina's stock ownership at the time, this bonus and gross-up figure represented approximately 10% of Ebix's value.[56]

G. *The (Abandoned) Merger with Goldman*

The Plaintiffs contend that Ebix's stock price has generally decreased in recent years. Specifically, it decreased from nearly $29 in February 2011 (which pegged Ebix's market capitalization at over $1 billion) to below $14 two years later.[57] During the interim, various persons—first in an anonymous online article and then in several federal securities class actions—accused Ebix of improper

---

[54] *Id.*

[55] *Id.* ¶ 68. None of the 2010, 2011, or 2012 Proxy Statements discloses or otherwise references any amendment to the ABA or the Base Price. *Id.* ¶ 66.

[56] *Id.* ¶ 68.

[57] *Id.* ¶¶ 69, 73.

accounting practices and inadequate financial disclosures.[58] Raina and the rest of the Board have denied these allegations.[59]

Near the end of this timeframe, according to the Plaintiffs, Raina sought to take advantage of the "enormous upside" created by the temporary reduction in Ebix's stock price.[60] To do so, he partnered with Goldman to take Ebix private.[61]

On May 1, 2013, Ebix and Goldman announced a merger agreement pursuant to which Ebix's public stockholders would receive $20.00 in cash per share. The consideration was approximately 7% above the pre-announcement closing price of Ebix stock, and the transaction implied an enterprise value, including assumed debt, of $820 million.[62]

Concurrently, Raina and Goldman entered into the Investment Letter Agreement (the "Investment Agreement") that would govern the consideration he (and his foundation) would receive in the merger.[63] Based on the disclosed $7.95 Base Price and the $20.00 per share merger price, Raina had the right under the ABA to demand a payment of approximately $84 million from Ebix.[64] But, under the terms of the Investment Agreement, Raina agreed to accept $32 million in cash

---

[58] *Id.* ¶¶ 70-72.  On May 10, 2013, Ebix would disclose that it had received subpoenas from the SEC related to the issues raised in the securities law class actions.  *Id.* ¶ 74.
[59] *Id.* ¶¶ 71, 74.
[60] *Id.* ¶ 75.
[61] *Id.* ¶ 76.
[62] *Id.*
[63] *Id.* ¶ 77.
[64] *Id.* ¶ 8. The Plaintiffs calculated the total payment owed to Raina as the sum of a bonus of over $53 million and a tax gross-up of over $30 million.  *Id.* ¶ 79.

and approximately 29% of the post-merger entity in exchange for his fully diluted 9.3% interest in Ebix and for waiving his rights under the ABA.[65] The Plaintiffs note that, were the Base Price not $7.95 but rather $23.84, then Raina would not have been entitled to any payment under the ABA in this transaction.[66]

The proposed merger and the accompanying flurry of lawsuits filed by Ebix stockholders in this Court were short-lived. Ebix and Goldman announced on June 19 that they had agreed to terminate the merger agreement.[67] The Investment Agreement, which was contingent on the merger, was also terminated.[68] The company's decision was partially based on a letter it had received from the United States Attorney for the Northern District of Georgia regarding a preliminary investigation related to the allegations in the securities class action lawsuits.[69] In a press release, Raina and another Ebix director maintained that the underlying allegations were without merit.[70]

Despite—or, perhaps, because of—the termination of the merger, the Plaintiffs pressed forward with their claims related to the ABA against the Defendants. They filed their Amended Complaint on August 27, 2013.

---

[65] *Id.* ¶¶ 7-8, 76-77.
[66] *Id.* ¶ 79.
[67] *Id.* ¶ 80.
[68] *Id.* ¶ 78.
[69] *Id.* ¶ 80.
[70] *Id.* ¶ 81.

## III.  CONTENTIONS

The Plaintiffs plead six causes of action against the Defendants.  In addition to a declaratory judgment claim regarding the ABA Base Price (Count I) and breach of fiduciary and unjust enrichment claims asserted against Raina individually (Counts III and VI), the Plaintiffs challenge certain decisions by the Board or the Outside Directors as a breach of fiduciary duty.  They denominate certain claims as direct (Counts II and IV) and others as derivative (Count V).  The Plaintiffs' classifications are not dispositive of the Court's analysis of the nature of those claims, but a brief overview of them is appropriate before addressing the Defendants' motion to dismiss under Court of Chancery Rules 23.1 and 12(b)(6).

The Plaintiffs challenge the following actions by the Board or the Outside Directors directly (Counts II and IV):

- Approving and maintaining the ABA as an unreasonable anti-takeover device;[71]

- Approving the ABA in violation of the 1996 Plan;[72]

- Omitting material information about the ABA in the 2009 Proxy Statement and the 2009 Special Meeting Proxy Statement;[73] and

---

[71] *Id.* ¶ 97.
[72] *Id.* ¶ 98.
[73] *Id.* ¶ 100.

17

- Stating inaccurately that the ABA Base Price was $7.95 in the 2010, 2011, and 2012 Proxy Statements.[74]

In addition, the Plaintiffs challenge the following conduct by the Board or the Outside Directors derivatively (Count V):

- Approving the ABA in violation of the 1996 Plan;

- Causing Ebix to file materially misleading or false SEC reports; and

- Receiving compensation under the invalid 2010 Plan.[75]

Among the remedies sought by the Plaintiffs are a declaration regarding the current ABA Base Price, an injunction preventing the Defendants from claiming that Raina is entitled to any bonus under the ABA, a declaration that the 2010 Plan was not validly approved by Ebix stockholders, rescission of the compensation that the Board has received under the 2010 Plan, and compensatory damages.

## IV. ANALYSIS

A. *The Procedural Standard of Review*

On the Defendants' motion to dismiss under Rule 12(b)(6), the Court accepts the well-pled allegations of the Amended Complaint as true and draws all reasonable inferences from those allegations in the Plaintiffs' favor.[76] Under this standard, the Court neither accepts conclusory allegations as true nor draws

---

[74] *Id.* ¶¶ 101, 110.
[75] *Id.* ¶ 114.
[76] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

unreasonable inferences from the Amended Complaint.[77]   The Court must determine whether the Plaintiffs could recover on each of their claims under "any reasonably conceivable set of circumstances susceptible of proof."  If recovery on a particular claim is not reasonably conceivable, then the Court must grant the Defendants' motion and thereby dismiss that claim under Rule 12(b)(6).[78]

B. *Laches*

As a court of equity, this Court may dismiss a claim as untimely under the doctrine of laches.  The question the Court asks when considering a laches defense is whether a party's unreasonable delay in asserting a claim has unfairly prejudiced the interests of the party against whom the claim is asserted.[79]   Although this standard is simple enough to articulate, it is often not so straightforward to apply on a Rule 12(b)(6) motion.

The analogous statute of limitations may guide the Court's laches inquiry,[80] but laches may also "bar a plaintiff in equity before the analogous statute of limitations has run."[81]   The analogous limitations period for breach of fiduciary

---

[77] *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[78] *See Cent. Mortg. Co.*, 27 A.3d at 536.

[79] *See Reid v. Spazio*, 970 A.2d 176, 183 (Del. 2009) ("[T]he laches inquiry is principally whether it is inequitable to permit a claim to be enforced, the touchstone of which is inexcusable delay leading to an adverse change in the condition or relations of the property or the parties.").

[80] *See U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 502 (Del. 1996).

[81] *In re Sirius XM S'holder Litig.*, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013).

duty and unjust enrichment claims arising under Delaware law is three years.[82] This period starts to run when the harm occurs, even if the injured party was unaware of the harm at the time.[83]

Typically, a claim filed after the limitations period has run is considered presumptively untimely, and presumptively untimely claims may be barred under laches at the pleadings stage unless the party asserting the claim alleges sufficient facts that warrant tolling.[84] The tolling doctrine most relevant here is equitable tolling, which may apply if the injured party did not learn the facts giving rise to the cause of action because it "reasonably relied upon the competence and good faith of a fiduciary."[85] But, tolling is usually unavailable after the injured party is on inquiry notice of the claim,[86] a standard that this Court has articulated in comparable stockholder litigation as when the exercise of "reasonable diligence" by a stockholder would have revealed the facts giving rise to the harm.[87]

---

[82] *See* 10 *Del. C.* § 8106.

[83] *See CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *7 (Del. Ch. Jan. 24, 2005).

[84] *See Whittington v. Dragon Gp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009).

[85] *In re Tyson Foods, Inc. Consol. S'holder Litig.*, 919 A.2d 563, 585 (Del. Ch. 2007).

[86] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004)

[87] *See, e.g.*, *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 646 (Del. Ch. 2013); *Weiss v. Swanson*, 948 A.2d 433, 452 (Del. Ch. 2008); *see also In re Tyson Foods, Inc.*, 919 A.2d at 591 (citing *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999) (TABLE)) ("[I]nvestors are under an obligation to exercise reasonable diligence in their affairs, and no succor from the statute of limitations should be offered a dilatory plaintiff in the absence of such care.").

Defendants may, of course, raise laches as an affirmative defense at the motion to dismiss stage. At times, this Court has dismissed claims on laches grounds under Rule 12(b)(6).[88] However, because of the procedural standard of review on a motion to dismiss—where the Court must accept the well-pled allegations as true and draw all reasonable inferences in the non-moving party's favor—laches is "not ordinarily well-suited for treatment on such a motion" unless there is no reasonably conceivable set of circumstances susceptible of proof in which laches does not bar the claim.[89]

The Defendants contend that any claim related to the Outside Directors' adopting the ABA in 2009 or the subsequent reduction of the Base Price alongside the stock dividend should be dismissed on laches grounds. They maintain that the Plaintiffs, like all Ebix stockholders, were on inquiry notice of the terms of the ABA and the reduction in the Base Price by at least March 2010, when the Board discussed these issues in detail in the 2009 Form 10-K.[90] In opposition, the Plaintiffs submit that, based on their allegations challenging the accuracy of the Board's disclosures of the Base Price, the Court should apply equitable tolling, if

---

[88] *See de Adler v. Upper N.Y. Inv. Co. LLC*, 2013 WL 5874645, at *12 n.145 (Del. Ch. Oct. 31, 2013) (identifying cases in which this Court has dismissed claims as untimely under laches at the motion to dismiss stage); *see also CertainTeed Corp.*, 2005 WL 217032, at *6 ("The timeliness of claims may be determined on a motion to dismiss if the facts pled in the complaint, and the documents incorporated within the complaint, demonstrate that the claims are untimely.").

[89] *See Reid*, 970 A.2d at 183.

[90] Reply Br. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Reply Br.") 2-9; Opening Br. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Opening Br.") 8-10.

not also fraudulent concealment, and conclude that the asserted claims are not barred by laches.[91]

The Defendants offer laches as an affirmative defense to primarily three categories of allegations and related claims: (i) whether the ABA violates the 1996 Plan; (ii) whether the ABA Base Price was reduced after the stock dividend; and (iii) whether the ABA is an unreasonable anti-takeover device. The Court addresses each category in turn.

### 1. Whether the ABA Violates the 1996 Plan (Counts II and V)

First, the Plaintiffs allege that the Outside Directors breached their fiduciary duties when they approved the ABA on terms that violate the 1996 Plan. To comply with the 1996 Plan, the ABA Base Price would allegedly have had to have been at least the market price of Ebix stock on the date the rights were evidenced by a written agreement—$37.32 on July 15, 2009, which is considerably higher than the initial $23.84 Base Price. The ABA also allegedly granted rights to Raina covering approximately 1.1 million shares of Ebix stock, which is considerably higher than the 1996 Plan's annual 125,000 share limit per recipient. In other words, the ABA purportedly violates the 1996 Plan because, among other reasons, it grants to Raina too many Appreciation Rights at a backdated, below-market Base Price.

---

[91] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Answering Br.") 16-24.

This claim is presumptively untimely because the alleged harm—the Outside Directors' approving the ABA in violation of the 1996 Plan—occurred in July 2009, more than three years before the Plaintiffs filed the Amended Complaint.[92] However, it is reasonably conceivable, based on the allegations of the Amended Complaint, that equitable tolling may apply. The Board stands in a fiduciary relationship with Ebix stockholders, including the Plaintiffs. The Plaintiffs reasonably relied on the good faith of the Board, specifically the Outside Directors, to properly administer the 1996 Plan, which, as alleged, the ABA violated.[93]

Additionally, it is reasonably conceivable that the Plaintiffs were not on inquiry notice more than three years before filing the Amended Complaint. No single SEC filing identified by the parties provided all the relevant material information necessary—such as a statement on whether the ABA is subject to the 1996 Plan—for the Plaintiffs to be deemed on inquiry notice of the alleged harm.

---

[92] The parties largely ignored the issue of whether, for laches purposes, the claims asserted regarding the ABA in the Amended Complaint, filed on August 27, 2013, should relate back to the first lawsuit challenging the Ebix and Goldman merger, filed on May 6, 2013.

The Court concludes that the Amended Complaint does not relate back because it challenges actions by the Board that did not arise "out of the conduct, transaction or occurrence set forth . . . in the original pleading." Ct. Ch. R. 15(c). Although the original pleadings sought to challenge the merger consideration Raina would receive for waiving his rights under the ABA, it is not fair to say that the Defendants were on sufficient notice that the Plaintiffs might assert the claims they have in the Amended Complaint. *See Telxon Corp. v. Bogomolny*, 792 A.2d 964, 972 (Del. Ch. 2007) ("The crucial consideration is whether a defendant had notice from the original pleadings that the plaintiff's new claim might be asserted against him."). That said, whether the Amended Complaint relates back is not dispositive of the Court's laches analysis.

[93] *See Weis*, 948 A.2d at 452 (citing *In re Tyson Foods, Inc.*, 919 A.2d at 950-51).

Rather, the relevant dates and contractual terms were scattered throughout several SEC filings, including:

- The 2004 Form 10-K, discussing the 1996 Plan;

- The July 2009 Form 8-K, disclosing that Ebix and Raina executed the ABA on July 15, 2009 with a $23.84 Base Price but *not* stating whether the ABA was subject to the 1996 Plan or that the $23.84 Base Price was the price of Ebix stock on March 25, 2009;

- The 2009 Form 10-K, disclosing that the Outside Directors agreed on this type of compensation for Raina on March 25, 2009, when the price of Ebix was $23.84 stock but *not* stating whether the ABA was subject to the 1996 Plan or discussing that it was executed on July 15, 2009; and

- The 2010, 2011, and 2012 Proxy Statements, disclosing and not disclosing largely the same information as in the 2009 Form 10-K.

Discovering the alleged harm would have required a careful and close reading of multiple SEC filings and incorporated exhibits by a stockholder strongly suspicious of the Board's disclosures. The Court cannot say, at the pleading stage, that such effort is required of a reasonably diligent stockholder for laches purposes.[94]

---

[94] *See Carsanaro*, 65 A.3d at 646-47 ("[S]tockholders need only be reasonably diligent. They are not required to examine every managerial act with a jaundiced eye, independently obtain and cull through corporate filings, and figure out the implications of four numbers in 27 pages of dense,

24

Although the Court may conclude otherwise at a later stage in this proceeding, the Plaintiffs' claims in Counts II and V regarding whether the ABA violates the 1996 Plan are not presently barred by laches.

### 2. Whether the ABA Base Price was Reduced after the Stock Dividend (Counts I, II, IV, and V)

Second, as part of their declaratory judgment and fiduciary duty claims, the Plaintiffs allege that the ABA Base Price was never reduced from the initial $23.84. On this point, were the Plaintiffs simply attacking the reduction of the Base Price after the stock dividend, then those claims would be barred under laches. The Plaintiffs would have been on inquiry notice about the purported $7.95 Base Price as early as the 2009 Form 10-K and again in the 2010 Proxy Statement, and the Plaintiffs would have unduly delayed in asserting their claims, thereby unfairly prejudicing the Defendants.[95]

---

single-spaced, legal text."); *Weiss*, 948 A.2d at 452 ("[T]he information needed to put Weiss on notice of his claims did not appear in one document. In order to discover the alleged pattern of timing, Weiss would have had to cull through the company's Form 4s each time they were filed, compare the grant dates of the options with the timing of the quarterly earnings releases, and then conduct a statistical analysis in order to uncover the alleged malfeasance. Such an investigation is beyond 'reasonable' diligence."); *In re Tyson Foods, Inc.*, 919 A.2d at 591 ("[I]t would be manifest injustice for this Court to conclude, as a matter of law, that 'reasonable diligence' includes an obligation to sift through a proxy statement, on the one hand, and a year's worth of press clippings and other filings, on the other, in order to establish a pattern concealed by those whose duty is to guard the interests of the investor.").

[95] To the extent that part of the derivative breach of fiduciary duty claim asserted in Count V can be construed as alleging that the Outside Directors "adopted an improperly reduced Base Price," Am. Compl. ¶ 114, that claim is barred by laches for these reasons.

But, that is not precisely what the Plaintiffs challenge. Rather, the Plaintiffs contend that the Base Price was never reduced from $23.84. Because, as alleged, the ABA does not provide for automatic anti-dilution protection and because, as further alleged, there has been no written amendment to the ABA, the Base Price is still $23.84. Based on these allegations, the Board's repeated disclosures that the Base Price is $7.95 would be inaccurate.

Again, for similar reasons as to whether the ABA violates the 1996 Plan, it is reasonably conceivable here that equitable tolling may apply and that the Plaintiffs were not on inquiry notice more than three years before filing the Amended Complaint. The Plaintiffs reasonably relied on the good faith of the Board as fiduciaries to disclose accurately all material information regarding the terms of the ABA.[96] Given the Board's consistent disclosures in the 2010, 2011, and 2012 Proxy Statements that the Base Price was $7.95, the Plaintiffs were not on inquiry notice of the harm because it is unclear how any amount of diligence by an Ebix stockholder, let alone merely reasonable diligence, would have revealed that the Base Price was still $23.84. On these facts, that the Board repeatedly disclosed the $7.95 Base Price in Ebix proxy statements does not foreclose, on laches grounds, the Plaintiffs from asserting that these disclosure were inaccurate.

---

[96] *See Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998); *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

Thus, the claims in Counts I, II, IV, and V regarding whether the ABA Base Price was reduced after the stock dividend are not presently barred by laches.

3. Whether the ABA is an Unreasonable Anti-Takeover Device (Count II)

Third, the Plaintiffs assert that the Board breached its fiduciary duties in approving and maintaining the ABA because it is an unreasonable anti-takeover device. In support of their allegations, the Plaintiffs quote from the July 2009 Form 8-K in which the Board suggested that the ABA was approved after the Board evaluated "the potential threat of the Company itself being an acquisition target" in light of "the prevailing comparatively low P/E multiple of Ebix's common stock."[97] The Plaintiffs note similar statements by the Board about the anti-takeover effects of the ABA in the 2010, 2011, and 2012 Proxy Statements.[98]

Any challenge to the July 2009 adoption of the ABA on this ground is barred by laches. This claim is presumptively untimely because the harm occurred more than three years before the Plaintiffs filed the Amended Complaint in August 2013. Tolling is inapplicable because the Board did not conceal its understanding of the effects of the ABA; rather, the Board repeatedly disclosed that the ABA may, in part, have anti-takeover effects. The Court concludes that the Plaintiffs have inappropriately "slumber[ed] on their rights" in asserting this claim.[99] Given

---

[97] Am. Compl. ¶ 32.
[98] *Id.* ¶ 67.
[99] *See Reid*, 970 A.2d at 182.

the years-long delay between the harm and this lawsuit, even if the Plaintiffs were arguably not on inquiry notice until the 2010 Proxy Statement, the Plaintiffs have nonetheless unduly delayed in bringing this claim now. This undue delay has unfairly prejudiced the Defendants, who are entitled to repose.

That said, the Plaintiffs also assert that the ABA continues to have anti-takeover effects on Ebix, and the Board's repeated disclosures to that effect do not undermine the Plaintiffs' position. Whether initial director approval of a device with anti-takeover effects is a valid exercise of business judgment does not foreclose a subsequent challenge to its continued existence or subsequent implementation.[100] This claim is timely because the alleged injury is ongoing. Thus, the Plaintiffs' challenge to the continued existence of the ABA is not barred by laches.

Accordingly, Count II, insofar as it asserts a claim regarding whether the ABA was improperly adopted as an unreasonable anti-takeover device (but not whether it has been improperly maintained as an unreasonable anti-takeover device), is barred by laches.

---

[100] *Cf. Moran v. Household Int'l, Inc.*, 500 A.2d 1346, 1357 (Del. 1985) ("While we conclude for present purposes that the Household Directors are protected by the business judgment rule, that does not end the matter. The ultimate response to an actual takeover bid must be judged by the Directors' actions at that time, and nothing we say here relieves them of their basic fundamental duties to the corporation and its stockholders. Their use of the Plan will be evaluated when and if the issue arises.").

## C. *Ripeness*

The issue of ripeness most often arises in the context of a petition for declaratory relief. Where there is an "actual controversy" between two parties,[101] this Court may hear a claim seeking a declaratory judgment as to a party's "rights, status and other legal relations."[102] It is not enough for the parties to be willing to litigate or for their allegations to conflict.[103] Rather, the Court must find four elements to conclude that an actual controversy exists:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination.[104]

Even if a controversy appears inevitable, a party seeking declaratory relief must still "show that there is a substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."[105]

---

[101] *See Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 479-80 (Del. 1989).

[102] 10 *Del. C.* § 6501.

[103] *See Stabler v. Ramsay*, 88 A.2d 546, 549 (Del. 1952) (concluding that there was no actual controversy regarding the devolution of property pursuant to a will, even though the parties expressed "a difference of opinion as to the effect of certain legal instruments," because "consent[] to jurisdiction is immaterial" to a ripeness inquiry).

[104] *XL Specialty Ins. Co. v. WMI Liquidating Trust*, — A.3d — 2014 WL 2199889, at *5 (Del. May 28, 2014) (citing *Stroud*, 552 A.2d at 479-80).

[105] *Energy P'rs, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *6 (Del. Ch. Oct. 11, 2006).

Ripeness, however, is not limited to the declaratory judgment context. Indeed, that the "actual controversy" inquiry for a declaratory judgment claim requires a controversy to be ripe for judicial determination necessarily means that it is possible for there to be non-declaratory judgment claims that are not ripe. Determining whether an issue is ripe for adjudication requires the Court to weigh various practical considerations including the need for prompt resolution of the claims, the possibility that future events may lead to a more fully developed dispute, and the limited nature of judicial resources.[106]

The Defendants assert that the claims related to the current terms of the ABA are not ripe because there is no justiciable controversy concerning its interpretation. In particular, they note that, without the now-abandoned merger between Ebix and Goldman, there is no pending transaction that may trigger Raina's rights. The necessary corollary to their position is that the claims brought against Raina individually are also not ripe because he cannot presently assert his right to payment under the ABA.[107] The Plaintiffs, meanwhile, submit that this dispute is ripe for adjudication, contending that no pending transaction is necessary

---

[106] *See Schick Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987).

[107] Defs.' Reply Br. 9-11; Defs.' Opening Br. 10-13. A fair reading of the Defendants' brief and presentation at oral argument reveals that they raised this argument, even if not in the most explicit manner.

 The Defendants contend that Raina agreed to forgo his right to payment under the ABA, rather than demand a payment, in the abandoned merger. *Id.* 12.

for the Court to declare the proper Base Price under the ABA or, by implication, to decide whether Raina has breached his fiduciary duties by retaining those rights.[108]

### 1. The Declaratory Judgment Claim (Count I)

The Court concludes that the declaratory judgment claim is not ripe. Although the facts involved—most notably, the ABA Base Price—are largely static, the disagreement between the parties does not presently rise to the level of an actual controversy. For example, the Plaintiffs do not allege that Raina's right to a payment under the ABA infringes on their stock ownership rights[109] or on the Board's ability to manage the business and affairs of Ebix.[110] Were there a pending transaction that implicated the ABA—such as the abandoned merger between Ebix and Goldman—then the Court might have concluded otherwise.[111] But, absent a pending transaction, there is no need for prompt resolution of this claim, let alone a need that outweighs the expense of limited judicial resources.

---

[108] Pls.' Answering Br. 24-30.

[109] *See, e.g.*, *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1072 (Del. Ch. 1985) (concluding that a claim challenging a poison pill that, "because of its deterrent features, presently affects shareholders' fundamental rights" was ripe for adjudication), *aff'd*, 500 A.2d 1346 (Del. 1985).

[110] *See, e.g., Carmody v. Toll Bros., Inc.*, 723 A.2d 1180, 1188 (Del. Ch. 1998) (concluding that a claim challenging a poison pill with "dead hand" features was ripe because of its "alleged current adverse impact" on the ability of the board to "exercise[e] the full array of powers provided by statute, including the power to redeem the poison pill").

[111] *Cf. In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1206 (Del. Ch. 2000) (concluding that a breach of fiduciary duty claim challenging the directors' decision to waive 8 *Del. C.* § 203 in the context of a pending transaction was ripe).

The Court's "common sense assessment" of these circumstances does not reveal an actual controversy warranting judicial resolution at this time.[112]

Thus, Count I is not ripe and must be dismissed, without prejudice.[113]

### 2. The Claims Asserted against Raina Individually (Counts III and VI)

Likewise, the Court concludes that the Plaintiffs' fiduciary duty and unjust enrichment claims asserted against Raina are also not ripe. The ABA does not grant to Raina anything more than a right to payment that depends on, among other conditions, the status of Raina's employment with Ebix and the amount of Ebix stock that he holds at the time of an acquisition transaction. Because there is no pending transaction, this cause of action is entirely contingent on factual circumstances that not only may not occur, but also may moot any decision by the Court.[114] In this context, the Plaintiffs' claims against Raina regarding the ABA are not ripe.

---

[112] *See XL Specialty Ins. Co.*, 2014 WL 2199889, at *6.

[113] The Court acknowledges that part of the Plaintiffs' theory of why this declaratory judgment claim is ripe is that the unreasonable anti-takeover effects of the ABA have been magnified by the Board's inaccurate disclosures to Ebix stockholders that the Base Price was reduced from $23.84 to $7.95. It may be the case (or, perhaps more accurately, there may be an expert willing to testify to the effect) that the difference in the disputed Base Price currently has an "overhang" effect on Ebix's stock price. But, those effects are far too speculative to justify the judicial resources necessary to issue a declaratory judgment. The Court cannot adopt the Plaintiffs' argument, the logic of which would allow stockholders to bring any number of declaratory judgment claims involving disputes over the interpretation of contracts to which the corporation is a party. What mitigates the Court's conclusion here, however, is the recognition that, unsurprisingly, the Plaintiffs may allege other, ripe causes of actions that would answer the sole question implicated by their unripe declaratory judgment claim: the current ABA Base Price.

[114] *See Multi-Fineline Electronix, Inc. v. WBL Corp. Ltd.*, 2007 WL 431050, at *8 (Del. Ch. Feb. 2, 2007) (dismissing a claim against a foreign controlling stockholder on personal

Counts III and VI asserted against Raina individually must be dismissed, without prejudice, as unripe.

D. *The Nature of the Plaintiffs' Claims*

Before analyzing the pleading sufficiency of the Plaintiffs' claims under Rules 23.1 and 12(b)(6), the Court must determine whether those claims are direct or derivative in nature. In *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,[115] the Delaware Supreme Court articulated how to distinguish direct and derivative claims through a two-part test: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[116] Generally, harm to the corporation or to all stockholders "pro rata in proportion with their ownership" would give rise to a derivative claim.[117] Conversely, harm to the stockholders independent of any harm to the corporation—for example, allegations of material misstatements or omissions in a proxy statement which "impaired the stockholders' right to cast an informed

---

jurisdiction grounds but alternatively dismissing the claim regarding how the controlling stockholder was purportedly required to vote its stock as not ripe because the Court concluded, based on the allegations of the complaint, that it was "literally impossible to predict" how the stockholder would vote); *Energy P'rs*, 2006 WL 2947483, at \*7 ("[I]f a plaintiff's action is 'contingent,' that is, if 'the action requires the occurrence of some future event before the action's factual predicate is complete,' the controversy is not ripe.") (citations omitted).

[115] 845 A.2d 1031 (Del. 2004).

[116] *Id.* at 1033.

[117] *See Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

vote"—would give rise to a direct claim.[118]  The Court should reach a conclusion on this issue by evaluating "the nature of the wrong alleged, not merely . . . the form of words used in the complaint."[119]

The parties disagree over whether the asserted claims are direct, derivative, or perhaps both.[120]  The Defendants argue that all the claims are derivative under *Tooley* because it is Ebix, and not the stockholders, which suffered the alleged harm and which would benefit from any recovery.[121]  The Plaintiffs, in response, submit that they have alleged both direct and derivative claims.  In particular, they contend that their disclosure claims allege conduct that injured Ebix stockholders—primarily the lack of an informed stockholder vote—and thus are direct breach of fiduciary duty claims.[122]

### 1.  The Purportedly Direct Claims (Counts II and IV)

The Plaintiffs allege that certain decisions of the Board or the Outside Directors represented a breach of fiduciary duty that may be challenged directly.

---

[118] *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) (citing *In re Tri-Star Pictures, Inc., Litig.*, 634 A.2d 319, 330 n.12, 332 (Del. 1993)); *see also Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *4-5 (Del. Ch. Feb. 20, 2009); *In re infoUSA, Inc. S'holders Litig.*, 953 A.2d 963, 1001 n.82 (Del. Ch. 2007); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005).

[119] *In re Syncor Int'l Corp. S'holders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004); *see also Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *16 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012) (TABLE).

[120] *See, e.g.*, *Gentile v. Rossette*, 906 A.2d 91, 99 (Del. 2006) ("There is, however, at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character.").

[121] Defs.' Reply Br. 11-14; Defs.' Opening Br. 13-14.

[122] Pls.' Answering Br. 30-35.

These actions include: (i) adopting the ABA in violation of the 1996 Plan; (ii) maintaining the ABA as an unreasonable anti-takeover device; (iii) making material misstatements in Ebix's proxy statements; and (iv) adopting the 2010 Plan pursuant to an uninformed, and thus invalid, stockholder vote.

(i) Adopting the ABA in Violation of the 1996 Plan (Count II)

The ABA purportedly granted Appreciation Rights within the meaning of the 1996 Plan to Raina. It did not grant any Ebix stock or any stockholder voting rights to him. The potential harm caused by the ABA—that Raina may receive a change-in-control payment that is improper under the 1996 Plan—is a harm suffered by Ebix. Any harm imposed upon individual Ebix stockholders (including Raina's own interest as a stockholder) arises pro rata to their investment in Ebix because of their status as the corporation's residual claimants.[123]

Whether the Outside Directors breached their fiduciary duties by adopting the ABA in violation of the 1996 Plan is a derivative claim.

---

[123] *See Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988) ("Suits against management for waste resulting from excessive payments of corporate funds (whether made to individual defendants or to third parties) do not affect contractual rights of shareholders associated with the ownership of common stock . . . . Thus, where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative in nature.").

(ii) Maintaining the ABA as an Unreasonable
Anti-Takeover Device (Count II)

Determining whether the Plaintiffs' challenge to the ABA as an unreasonable anti-takeover device is a direct claim or a derivative claim is a less-than-precise exercise. This Court, in *In re Gaylord Container Corp. Shareholders Litigation*,[124] outlined the tension in Delaware corporate law regarding the relationship between stockholder challenges to anti-takeover devices and Rule 23.1.[125] As *Gaylord Container* explained, however, this potentially thorny issue may be largely avoided when resolving the Defendants' motion to dismiss under Rule 23.1 if the claim implicates the heightened scrutiny of *Unocal Corporation v. Mesa Petroleum*[126] and its progeny: if the claim is derivative, then demand is excused,[127] and if the claim is direct, then no demand was ever necessary under the Court of Chancery Rules.[128]

Thus, for present purposes, the Court first considers whether this claim implicates *Unocal*. "Enhanced judicial scrutiny under *Unocal* applies "whenever the record reflects that a board of directors took defensive measures in response to

---

[124] 747 A.2d 71 (Del. Ch. 1999).

[125] *See id.* at 75-83.

[126] 493 A.2d 946 (Del. 1985).

[127] *In re Gaylord Container Corp.*, 747 A.2d at 81 (citing *Moran*, 490 A.2d at 1071).

[128] The Court acknowledges that the analysis of *Gaylord Container* operated within the framework of the "special injury" test of *Lipton v. News Int'l, Plc*, 514 A.2d 1075 (Del. 1986), which may not have survived *Tooley*. While the underlying Delaware law regarding this Court's inquiry into the nature of a stockholder plaintiff's claim may have changed, the implicit logic of *Gaylord Container* on this point remains compelling today.

a 'perceived threat to corporate policy and effectiveness which touches upon issues of control.'"[129] The circumstances here do not fit squarely within the rubric of a claim challenging either excessive payments to corporate officers or a more traditional anti-takeover device, such as a poison pill or other defensive-minded conduct by a board of directors. The ABA, from one persuasive perspective, may be nothing more than a so-called "golden parachute" agreement, which would reduce the Plaintiffs' claim to a derivative, waste claim[130] typically outside the bounds of *Unocal*. Then again, from another persuasive perspective, the ABA might just be the type of golden parachute that, because of its size, may be said to have unreasonable anti-takeover effects by increasing the minimum amount that a potential acquirer would have to pay above Ebix's market capitalization for shareholders to receive consideration above the current trading price.

It is difficult for the Court to reconcile these two perspectives, particularly given the lack of nuanced arguments submitted in the parties' briefs and at oral argument on this issue. But, for purposes of the Defendants' motion to dismiss under Rule 23.1 and Rule 12(b)(6), the Court must accept as true the Plaintiffs' allegations regarding the Board's disclosures, and a reasonable inference from those allegations is that the Board considered the ABA to have anti-takeover

---

[129] *In re Santa Fe Pac. Corp.*, 669 A.2d at 71 (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1372 n.9 (Del. 1995)) (internal quotations omitted).
[130] *See, e.g.*, *Kramer*, 546 A.2d at 353.

effects.  Although one may have reason to doubt whether those disclosures foreshadow the Court's ultimate conclusions of law, those statements by the Board about its understanding of the ABA cannot be ignored.  The Court concludes that the Plaintiffs' claim challenging the continuing anti-takeover effects of the ABA states a reasonably conceivable claim under *Unocal* because this aspect Count II sufficiently alleges "threatened external action from which it could reasonably be inferred that the defendants acted 'defensively.'"[131]  Thus, under *Gaylord Container*, whether this claim is direct or derivative is immaterial to the present motion.

The Defendants' motion to dismiss this aspect of Count II under Rules 23.1 and 12(b)(6) is denied.

### (iii)  Making Material Misstatements in Ebix Proxy Statements (Count II)

The Plaintiffs allege that the Board made material misstatements regarding the ABA and the Base Price in five proxy statements.  When the Board requested stockholder action on a corporate proposal, Delaware law requires that it have accurately disclosed all material information.[132]  "Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is almost always an individual, not corporate,

---

[131] *Gantler v. Stephens*, 965 A.2d 695, 705 (Del. 2009).
[132] *See Malone*, 722 A.2d at 12; *Stroud*, 606 A.2d at 84.

harm."[133]  The material misstatements at issue here—in the 2009 Special Meeting Proxy Statement and the 2009, 2010, 2011, and 2012 Proxy Statements—allegedly deprived Ebix stockholders of the ability to cast an informed vote.

These disclosure-based fiduciary duty claims are direct claims.

### (iv) Adopting the 2010 Plan Pursuant to an Invalid Stockholder Vote (Count IV)

The Board sought approval of the 2010 Plan by Ebix stockholders in the 2010 Proxy Statement.  The Plaintiffs assert that the 2010 Proxy Statement included material misstatements regarding the ABA and Base Price such that the corresponding vote on the 2010 Plan, as required by NASDAQ rules, was uninformed and thereby invalid.  This claim, as an extension of the Plaintiffs' other disclosure claims, implicates the right of Ebix stockholders to be fully informed by the Board about the matter on which they are requested to vote.[134]  Ebix stockholders like the Plaintiffs suffered an injury independent of any harm to the corporation, and Ebix stockholders would benefit from any recovery here.

Thus, the Plaintiffs' claim regarding whether the Board adopted the 2010 Plan pursuant to an invalid stockholder vote is also a direct claim.

---

[133] *In re Tyson Foods, Inc.*, 919 A.2d at 601; *see also In re J.P. Morgan Chase & Co.*, 906 A.2d at 772 (citing *In re Tri-Star Pictures, Inc.*, 634 A.2d at 330 n.12, 332) ("This Court has recognized, as did the Court of Chancery, that where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct.").

[134] *See In re J.P. Morgan Chase & Co.*, 906 A.2d at 772; *In re Tyson Foods, Inc.*, 919 A.2d at 601.

2. The Purportedly Derivative Claims (Count V)

The Plaintiffs also denominate derivative breach of fiduciary duty claims against the Board or the Outside Directors. The allegedly harmful conduct includes: (i) adopting the ABA in violation of the 1996 Plan; (ii) causing Ebix to file materially misleading or false statements with the SEC; and (iii) receiving compensation under the 2010 Plan.

(i) Adopting the ABA in Violation of the 1996 Plan

The Court previously concluded that whether the Board adopted the ABA in violation of the 1996 Plan is a derivative fiduciary duty claim. Because this aspect of Count V is entirely duplicative of the same aspect of Count II, one of these claims should be dismissed. For clarity, the Court concludes that this derivative claim should proceed under Count V; the related aspect of Count II is dismissed.

(ii) Causing Ebix to Make Misleading or False SEC Filings

The precise claim that the Plaintiffs seek to assert is not entirely clear.[135] The Court interprets this claim to assert nothing more than an allegation that the Board breached its fiduciary duties by filing materially misleading or false statements with the SEC. This purportedly derivative claim appears to overlap with the direct disclosure claims, but it is distinct in one fundamental way: the

---

[135] The parties largely did not address the Plaintiffs' claim that the Board breached its fiduciary duties by causing Ebix to make misleading or false SEC filings in their briefs or at oral argument. Nonetheless, the Court will consider the merits of this claim.

40

Board's disclosing accurate, material information when seeking stockholder action is a matter of Delaware law under the internal affairs doctrine,[136] but the Board's complying with SEC rules and regulations when filing information with the SEC is not. Instead, that issue is governed by the federal securities laws, over which this Court does not have subject matter jurisdiction.[137]

Accordingly, this claim must be dismissed under Court of Chancery Rule 12(h)(3) for lack of subject matter jurisdiction.[138]

(iii) Receiving Compensation under the 2010 Plan

The Outside Directors were allegedly granted 9,000 options each pursuant to the 2010 Plan after Ebix's 2010, 2011, and 2012 annual meetings. Raina also received restricted shares under the 2010 Plan in 2012. The Plaintiffs challenge these grants as a breach of fiduciary duty because they were made pursuant to the 2010 Plan that was, in turn, invalidly approved by stockholders because of the purported material misstatements in the 2010 Proxy Statement. The Court

---

[136] *See McDermott Inc. v. Lewis*, 531 A.2d 206, 215 (Del. 1987).
[137] *See, e.g.*, *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 20 (Del. Ch. 2009) (citing 15 U.S.C. § 78aa).
[138] The Court acknowledges that the presence of other circumstances may have changed this conclusion. For example, were a federal district court to conclude that Ebix's SEC filings violated the federal securities laws, then the Court may have jurisdiction to determine whether such conduct was a breach of fiduciary duty.

concludes that primary party injured by this conduct is Ebix, the same party to whom any recovery would go.[139]

Thus, whether the Board members breached their fiduciary duties by receiving compensation under the 2010 Plan is a derivative claim.

3. A Summary of the Plaintiffs' Claims

In sum, the Court concludes that the Plaintiffs assert the following direct claims:

- Material misstatements in Ebix's proxy statements (Count II)

- Invalidity of the 2010 Plan (Count IV)

The Plaintiffs also assert the following derivative claims:

- Adoption of the ABA in violation of the 1996 Plan (Count V)

- Receipt of compensation under the 2010 Plan (Count V)

---

[139] Because the Plaintiffs did not raise whether their breach of fiduciary duty theory here—the issuance of stock option to directors constituting a majority of the Board pursuant to a stock option plan that, as the Court will discuss, may not have been effectively ratified by stockholders due to material, inaccurate statements in the relevant proxy—may also give rise to a direct claim under *Tooley*, particularly in light of how *Gentile*'s "expropriation principle" is described in *Carsanaro*, the Court declines to hypothesize an answer to this interesting question of Delaware corporate law. *See Carsanaro*, 65 A.3d at 658 ("In my view, the Delaware Supreme Court's decisions [in *Tooley* and *Gentile*] preserve stockholder standing to pursue individual challenges to self-interested stock issuances when the facts alleged support an actionable claim for breach of the duty of loyalty. . . . Standing will also exist if the board that effectuated the transaction lacked a disinterested and independent majority. Standing will not exist if there is no reason to infer disloyal expropriation, such as when stock is issued to an unaffiliated third party, as part of an employee compensation plan, or when a majority of disinterested and independent directors approves the terms.").

Finally, the Plaintiffs challenge the continued existence of the ABA as an unreasonable anti-takeover device. For the reasons stated earlier, the nature of this last claim need not be resolved now.

### 4. Whether the Plaintiffs May Assert Direct and Derivative Claims

The parties dispute whether it is proper under Delaware law for the Plaintiffs to assert direct and derivative claims in the same lawsuit.[140] One of the primary concerns where both direct and derivative claims are alleged is the possibility of an inherent conflict of interest for the Plaintiffs' counsel: at the same time that the Plaintiffs assert the direct claims as stockholders *against* Ebix and the Board, they are simultaneously asserting derivative claims *on behalf of* Ebix against the Board.[141] This possible conflict may, in some situations, be strong enough to warrant bifurcating the litigation or dismissing either the direct or derivative claims.[142] Here, however, there does not appear to be the potential for such a

---

[140] Defs.' Reply Br. 14-17; Pls.' Answering Br. 44-46; Defs.' Opening Br. 14-15.

[141] *Cf. St. Clair Shores Gen. Employees Ret. Sys. v. Eibeler*, 2006 WL 2849783, at *8 (S.D.N.Y. Oct. 4, 2006) (applying Delaware law and concluding that "[g]iven that an impermissible conflict of interest may prevent Plaintiff from advancing its derivative and direct disclosure claims in the same action, and that Plaintiff's Direct Common Law Disclosure Claims are primarily derivative in nature, the Court will treat these disclosure claims as derivative for the purposes of the present motion to stay.").

[142] *Cf. Scopas Tech. Co. v. Lord*, 1984 WL 8266, 10 Del. J. Corp. L., 306, 310-11 (Del. Ch. Nov. 20, 1984) (dismissing the stockholder plaintiff's derivative counterclaims under Rule 23.1 because, among other reasons, the stockholder was not an adequate class representation in light of the considerably higher damages sought in a simultaneous breach of contract counterclaim and certain disparaging comments made about the corporation).

disabling conflict because the claims are not internally inconsistent.[143]   Neither bifurcating nor dismissing part of the action appears to be the most efficient use of the parties' or the Court's resources because the same factual issue underlies all the claims: the Base Price under the ABA.

Thus, the Court concludes that the Plaintiffs may assert these direct and derivative claims together in this action.[144]

E. *Demand Futility under Rule 23.1*

The Plaintiffs did not make a demand on the Board before filing the Amended Complaint.[145]   Therefore, in order to maintain their derivative claims under Rule 23.1, the Plaintiffs must plead with particularity the reasons why demand is excused—that is, why making a demand on the Board to assert these claims, on behalf of Ebix, would have been a futile endeavor.

The demand futility standard embodies one of the fundamental principles of Delaware corporate law: "[t]he business and affairs" of the corporation—including the decision about whether to file a lawsuit—is "managed by or under the direction

---

[143] *Cf. TCW Tech. Ltd. P'ship v. Intermedia Commc'ns, Inc.*, 2000 WL 1654504, at *4 (Del. Ch. Oct. 17, 2000) (consolidating several derivative and class action complaints and appointing lead counsel because "[t]he derivative and class claims all arise from the same basic facts and none of the claims are internally inconsistent or conflict with the legal theories supporting any other claim.").

[144] If a conflict does arise, then the Court may reconsider this conclusion.

[145] Am. Compl. ¶¶ 89-90.

of a board of directors."[146]  Through their derivative claims, the Plaintiffs seek to stand in the shoes of Ebix, without director approval, and assert claims of the corporation against the Board.  It is only proper for them to do so if there is a sufficient reason to believe that the Board is "incapable of making an impartial decision regarding the pursuit of the litigation."[147]  The two demand futility tests under Delaware law—as outlined by the Supreme Court in *Aronson v. Lewis*[148] and *Rales v. Blasband*[149]—represent the framework in which the Court must determine whether the Plaintiffs may maintain their derivative claims.

Which of *Aronson* or *Rales* applies depends on the conduct being challenged and the composition of the board when the derivative action is filed.  In brief, the *Aronson* test applies where a stockholder challenges a business decision "made by the same directors who remain in office at the time [the derivative] suit is filed."[150]  Conversely, the *Rales* test applies when the stockholder does not challenge a particular business decision or when a majority of the directors who made the business decision at issue have been replaced by the time the derivative lawsuit is

---

[146] 8 *Del. C.* § 141(a); *see also Spiegel v. Buntrock*, 571 A.2d 767, 773 (Del. 1990) (citing *Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981)) ("The decision to bring a law suit or to refrain from litigating a claim on behalf of a corporation is a decision concerning the management of the corporation.").

[147] *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008).

[148] 473 A.2d 805 (Del. 1984).

[149] 634 A.2d 927 (Del. 1993).

[150] *In re China Agritech, Inc. S'holder Deriv. Litig.*, 2013 WL 2181514, at *15 (Del. Ch. May 21, 2013).

filed.[151]  Here, *Aronson* governs because the Plaintiffs challenge the business decisions of the Board or the Outside Directors—the same directors in office when the Plaintiffs filed the Amended Complaint.

The Court must determine under *Aronson* whether, "under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."[152]  The test is disjunctive; satisfying either prong is sufficient.[153]  To meet the first prong of *Aronson*, the Plaintiffs would have to demonstrate through particularized allegations that at least half of the Board is interested or not independent.[154]  To meet the second *Aronson* prong, the Plaintiffs would have to allege "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."[155]

---

[151] *See Rales*, 634 A.2d at 934 (noting that this test would also apply when "the decision being challenged was made by the board of a different corporation").

[152] *Aronson*, 473 A.2d at 814.

[153] *See Brehm v. Eisner*, 746 A.2d 244, 255 (Del. 2000).

[154] *See In re infoUSA, Inc.*, 953 A.2d at 989-90; *see also Beneville v. York*, 769 A.2d 80, 86 (Del. Ch. 2000) ("[I]t thus makes little sense to find that demand is required in an evenly divided situation. The reality is that a majority vote is required to prevail on a board motion to cause the corporation to accept a demand; an evenly divided vote does not suffice.").

[155] *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 824 (Del. Ch. 2005), *aff'd*, 906 A.2d 766 (Del. 2006) (quoting *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003)).

Demonstrating demand futility under this second prong has been described as a "heavy burden" for a stockholder plaintiff.[156]

The Defendants maintain that the Plaintiffs have not satisfied Rule 23.1 for want of particularized allegations that meet either prong of *Aronson*. While not contesting, for this motion, that Raina may be deemed interested in a demand futility analysis as the counter-party to the ABA, they argue that the Plaintiffs have utterly failed to plead particularized facts regarding the lack of independence or the interest of the Outside Directors.[157] Similarly, the Defendants submit that the Plaintiffs have failed to establish, through particularized factual allegations, a reasonable doubt regarding the merits of the challenged decisions of the Board or the Outside Directors.[158] Rejecting those contentions, the Plaintiffs submit they have satisfied both prongs of the *Aronson* demand futility standard. In particular, they assert that their particularized allegations of fact raise a reasonable doubt as to whether the Outside Directors' approving the ABA was a valid exercise of business judgment because the initial Base Price and number of shares considerably exceeded what was permitted under Ebix's 1996 Plan.[159]

---

[156] *See White v. Panic*, 783 A.2d 543, 551 (Del. 2001).
[157] Defs.' Reply Br. 17-21.
[158] *Id.* 21-23; Defs.' Opening Br. 15-18.
[159] Pls.' Answering Br. 35-44.

1. The Procedural Standard of Review

When resolving the Defendants' motion to dismiss under Rule 23.1, the Court accepts the particularized factual allegations of the Amended Complaint as true.[160] "[C]onclusory allegations are not considered as expressly pleaded facts or factual inferences." The Court also views all reasonable inferences that "logically flow" from those particularized allegations in the Plaintiffs' favor.[161] "Demand futility analysis is conducted on a claim-by-claim basis."[162]

2. Whether the Outside Directors Violated the 1996 Plan
   by Approving the ABA

The Plaintiffs allege that the Outside Directors breached their fiduciary duties by adopting the ABA in violation of the 1996 Plan. Their theory is two-fold: (i) the ABA is subject to the 1996 Plan; and (ii) the ABA violates the 1996 Plan—most prominently because the initial Base Price should have been at least $37.32 instead of $23.84.

Assuming, without deciding, that Raina is interested as the counter-party to the ABA, the Plaintiffs must still allege with particularity that at least two other Ebix directors are interested or not independent to establish demand futility under the first *Aronson* prong. The relevant interest and lack of independence standards

---

[160] *See Rales*, 634 A.2d at 931.
[161] *See Brehm*, 746 A.2d at 255.
[162] *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014) (citing *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 977 (Del. Ch. 2003), *aff'd*, 845 A.2d 1040 (Del. 2004)).

are familiar. A director is interested by being on both sides of the transaction or by receiving a material benefit, or suffering a material detriment, that is not shared with the corporation's stockholders.[163] A director lacks independence if he or she is "beholden" to another's interest such that his or her business judgment "would be sterilized"[164] or if a conflicted director votes on a proposal but fails to disclose a material interest that a reasonable director would regard as significant in evaluating the proposal's merits.[165] The Court's inquiry is a "fact-intensive, director-by-director analysis."[166]

The Plaintiffs' particularized allegations regarding the interest or lack of independence for the Outside Directors are sparse. Two directors—Benz and Keller—comprised the Compensation Committee, which recommended that the Outside Directors approve the ABA. Mere membership on the committee that recommended the ABA, without more, is not a particularized allegation showing Benz's or Keller's interest or lack of independence.[167] The other particularized allegations of the Amended Complaint about the Compensation Committee, to the

[163] *See Orman v. Cullman*, 794 A.2d 5, 23 (Del. Ch. 2002) (citing *Aronson*, 473 A.2d at 812).

[164] *Rales*, 634 A.2d at 936; *Aronson*, 473 A.2d at 814-15.

[165] *See In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 363 (Del. Ch. 2008) (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1168 (Del. 1995)).

[166] *Postorivo v. AG Paintball Hldgs., Inc.*, 2008 WL 553205, at *6 (Del. Ch. Feb. 29, 2008).

[167] *Cf. In re China Auto. Sys. Inc. Deriv. Litig.*, 2013 WL 4672059, at *8-9 (Del. Ch. Aug. 30, 2013) ("This Court has consistently found that just being a director on the committee where the alleged wrongdoing is 'within [its] delegated authority' does not give rise to a substantial threat of personal liability under [*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996)] without supporting allegations of particularized facts showing bad faith.").

extent there are any, do not give rise to any reasonable inference that either Benz or Keller could not impartially consider a demand.

The particularized allegations regarding the interest or lack of independence of the three other Ebix directors—Bhalla, Eckert, and Herter—are even weaker than those about the Compensation Committee. None of these three directors stood on both sides of the ABA. None received a benefit from or suffered a detriment due to the ABA, let alone a material benefit or detriment. The Plaintiffs have failed to allege with particularity that Raina exercised sufficient control over these individuals as to sterilize their business judgment. Nor could the Plaintiffs allege that Raina (who did not vote to approve the ABA) failed to disclose his interest in the ABA—for that interest was obvious. In sum, because there are no particularized allegations demonstrating that at least half the Board is interested or not independent, demand is not excused under the first prong of *Aronson* for this derivative claim.

Neither is demand excused under the second *Aronson* prong. Absent particularized allegations that the Outside Directors were not adequately informed or not acting in good faith,[168] general allegations that they violated the 1996 Plan— a stockholder-approved, incentive-based compensation plan—are not enough to

---

[168] *See In re Walt Disney Co.*, 825 A.2d at 286.

excuse demand.[169]  Informed decisions made in good faith by independent and disinterested directors, including decisions interpreting or implementing a stock option plan, are almost always beyond judicial second-guessing, even if some of those decisions may not be "correct."[170]  Whether the ABA is, in fact, subject to the 1996 Plan is not dispositive of the Court's analysis of demand futility.

Rather, as this Court recently noted in *Pfeiffer v. Leedle*, "demand will be excused . . . when a plaintiff pleads particularized facts that indicate that the board knowingly or deliberately failed to adhere to the terms of a stock incentive plan."[171]  Thus, the Court must determine whether the Plaintiffs' particularized allegations support a reasonable inference that the Outside Directors knowingly violated the 1996 Plan by approving the ABA.  The Court may be able to infer reasonably a knowing or intentional violation based on particularized allegations of the unambiguous terms of the incentive-based compensation plan,[172] the

---

[169] *Cf. Seinfeld v. Slager*, 2012 WL 2501105, at \*16 (Del. Ch. June 29, 2012) (concluding that "a bald assertion of non-conformance with the plan" was not a particularized allegation to excuse demand regarding a waste claim for payments made under a stockholder-approved incentive plan designed to encourage "synergies" after a recent merger).

[170] *See Pfeiffer v. Leedle*, 2013 WL 5988416, at \*5 (Del. Ch. Nov. 8, 2013) ("So long as corporate fiduciaries act in the procedurally responsible manner outlined by the business judgment rule, the substance of their decisions is relevant only in exceptionally rare circumstances."); *see also Orman*, 794 A.2d at 20 ("[T]he judgment of a properly functioning board will not be second-guessed . . . .").

[171] *See Pfeiffer*, 2013 WL 5988416, at \*5; *see also Ryan v. Gifford*, 918 A.2d 341, 354 (Del. Ch. 2007) ("A board's knowing and intentional decision to exceed the shareholders' grant of express (but limited) authority raises doubt regarding whether such decision is a valid exercise of business judgment and is sufficient to excuse a failure to make demand.").

[172] *See Friedman v. Khosrowshahi*, 2014 WL 3519188, at \*12 (Del. Ch. July 16, 2014) (declining to infer a knowing violation where "[a]t most, [the plaintiff's] interpretation of the

51

unambiguous terms of the award in dispute,[173] the circumstances surrounding the disputed award,[174] or other relevant facts.[175]

No unambiguous provision of the ABA or the 1996 Plan mandates that the former be subject to the latter. The ABA is silent as to whether it is subject to the 1996 Plan.[176] Neither are the terms of the 1996 Plan dispositive, as the Plaintiffs have not alleged with particularity that the 1996 Plan governs all incentive-based compensation that may be issued to Ebix officers, directors, and employees. Without any particularized allegations about the specific relationship between the

RSU Award raises a potential ambiguity that the Compensation Committee was entitled to interpret and resolve under the Plan"); *Sanders v. Wang*, 1999 WL 1044880, at *7-9 (Del. Ch. Nov. 8, 1999) (inferring a knowing violation because the board, after several recent stock splits, issued awards in excess of the unambiguous aggregate limits of the stock incentive plan where other unambiguous terms did not allow for adjustments to those limits, even after a change to the company's capital structure).

[173] *See Pfeiffer*, 2013 WL 5988416, at *7-8 (inferring a knowing violation because the board granted an award in excess of the unambiguous annual per-recipient limit on a form that unambiguously provided that the award was subject to the company's stock option plan).

[174] *See London v. Tyrrell*, 2008 WL 2505435, at *6 (Del. Ch. June 24, 2008) (inferring an intentional violation because the board manipulated the fair market valuation underlying the option awards and used an exercise price that was lower than the minimum requirement of fair market value).

[175] *See, e.g.*, *Conrad v. Blank*, 940 A.2d 28, 39 (Del. Ch. 2007) (inferring that the board knowingly backdated options in violation of the company's stock option plan in part because the plaintiff "provided the court with a statistical analysis to bolster the inference that grants were deliberately backdated to more favorable dates in violation of the company's stated procedures"); *Ryan v. Gifford*, 918 A.2d 341, 354-55 (Del. Ch. 2007) (inferring that the board knowingly backdated options based in part on specific allegations of "highly suspicious timing" that, in light of "empirical evidence" suggesting that the "average annualized return of 243% on option grants to management was almost ten times higher than the 29% annualized market returns in the same period," was "too fortuitous to be mere coincidence").

[176] Lyons Trans. Aff. Ex. 1 (Ebix, Inc. Current Report (Form 8-K), at Ex. 99.1 (July 21, 2009)). The Court may consider the contents of the ABA because, as an integral source of the Plaintiffs' allegations, it is incorporated into the Amended Complaint. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69–70 (Del. 1995).

ABA and the 1996 Plan, it would be unreasonable for the Court to infer that the Outside Directors knowingly violated the 1996 Plan by agreeing to the ABA. Aside from their conclusory allegations that the ABA violates the 1996 Plan because it granted to Raina "Acquisition Rights within the meaning of the 1996 Plan,"[177] the Plaintiffs do not otherwise challenge the Outside Directors' decision to approve the ABA. Consequently, the Plaintiffs have failed to establish demand futility under the second prong of *Aronson* because their particularized allegations do not raise a reasonable doubt as to the business judgment exercised by the Outside Directors in approving the ABA.

Because the Plaintiffs have not established demand futility under either *Aronson* prong, this derivative claim must be dismissed under Rule 23.1.

### 3. Whether the Board Members Breached their Fiduciary Duties by Receiving Compensation Pursuant to the 2010 Plan[178]

The Plaintiffs also contend that the Board members breached their fiduciary duties by receiving compensation awards (options for the Outside Directors and restricted shares for Raina) pursuant to the 2010 Plan that, as alleged, was not approved by a fully informed stockholder vote. Again, to satisfy the first *Aronson*

---

[177] Am. Compl. ¶ 44.

[178] One could suggest that the Plaintiffs did not argue this derivative claim with quite the fervor with which their allegations are presented here. Then again, the Plaintiffs' answering brief directly responded to the contentions of the Defendants' opening brief, and the Defendants did not explicitly seek to dismiss this claim. Even if the Court may be reading too much into the Plaintiffs' express arguments, the particularized allegations that substantiate this claim do not seem to have been alleged for any purpose other than to substantiate this claim.

prong, the Plaintiffs must allege with particularity that at least three members of the Board were interested or not independent.

In many respects, the Plaintiffs' allegations resemble those in this Court's recent decision in *Cambridge Retirement System v. Bosnjak*. Here, as in *Bosnjak*, stockholder plaintiffs challenge the incentive-based compensation received by a majority of the board. What further informs the Court's analysis here are the merits of the Plaintiffs' claim that stockholder ratification of the 2010 Plan was not valid because of material, inaccurate statements in the 2010 Proxy Statement. Regardless of whether the challenged compensation awards were material to the individuals who received them, the Board is inherently interested, for purposes of Rule 23.1, in the options or restricted shares they received.[179] Thus, demand is excused because a majority of the Board could not have impartially considered a demand regarding this claim.

The Defendants' motion to dismiss this claim under Rule 23.1 is denied.

---

[179] *Bosnjak*, 2014 WL 2930869, at *3-6; *see also London*, 2008 WL 2505435, at *5 ("Although the general rule holds that 'demand is not excused simply because directors receive compensation from the company or an executive of the company,' the receipt of stock options is different. Directors who have received the options plaintiffs seek to challenge 'have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits.'") (citations omitted); *Steiner v. Meyerson*, 1995 WL 441999, at *11 (Del. Ch. July 19, 1995 ("As the outside directors comprise a majority of the Telxon board and are personally interested in their compensation levels, demand upon them to challenge or decrease their own compensation is excused.").

F. *Failure to State a Claim under Rule 12(b)(6)*

 1. The Direct Claim Regarding Material Misstatements in
    Ebix Proxy Statements (Counts II and IV)

To satisfy the standard of conduct demanded of their position as fiduciaries, directors of Delaware corporations must "disclose fully and fairly all material information within the board's control" when requesting stockholder action.[180] This Court reviews alleged violations of this so-called duty of disclosure under a materiality standard, which seeks to strike the appropriate balance for stockholders to have enough background to make a fully informed decision without receiving unnecessary or irrelevant minutia that may frustrate that goal.[181]

Information is material, and thus must be disclosed, "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote"—in other words, if it would alter the "total mix" of available information.[182] Whether a particular detail qualifies as material is a "mixed question of fact and law."[183]

---

[180] *Stroud*, 606 A.2d at 84.
[181] *See, e.g.*, *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *6 (Del. Ch. Dec. 18, 2009) ("[T]oo much information can be as misleading as too little."); *see also Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) ("Omitted facts are not material simply because they might be helpful.").
[182] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985).
[183] *See Cede & Co. v. Technicolor, Inc.*, 636 A.2d 956, 957 (Del. 1994).

Of course, in addition to including all material information, a board's request for stockholder action must also disclose accurate information.[184]

> To state a claim for breach of the fiduciary duty of disclosure on the basis of a false statement or representation, a plaintiff must identify (1) a material statement or representation in a communication contemplating stockholder action (2) that is false.[185]

Directors are subject to this standard of conduct even when they seek stockholder approval that is not prescribed by Delaware law.[186]

The failure of a board to disclose all material information accurately when seeking stockholder action does not necessarily establish that compensatory damages are appropriate.[187] Whether compensatory damages are available depends, in no small part, on the matter on which the stockholders are being solicited to vote. In limited circumstances, post-closing damages may be available for material misstatements or omissions in a proxy statement seeking stockholder approval of a transaction.[188] But, the availability of post-annual-meeting damages

---

[184] *Malone*, 722 A.2d at 11 ("Inaccurate information in these contexts [including a proxy statement seeking stockholder action] may be the result of a violation of the fiduciary duties of care, loyalty, or good faith.").

[185] *Pfeffer v. Redstone*, 965 A.2d 676, 685 (Del. 2009) (quoting *O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 920 (Del. Ch. 1999)).

[186] *See, e.g.*, *Lewis v. Vogelstein*, 699 A.2d 327, 330 (Del. Ch. 1997) (citing *In re Tri-Star Pictures, Inc.*, 634 A.2d at 333) (noting that the well-established disclosure obligations apply even where "shareholder approval was not required for the authorization of [a] transaction and was sought only for its effect on the standard of judicial review").

[187] *See Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 146-47 (Del. 1997) ("[T]here is no per se rule that would allow damages for all director breaches of the fiduciary duty of disclosure.").

[188] *See In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 53 (Del. Ch. 2014).

for misstatements or omissions in a proxy statement for the election of directors is less clear.

> There may be circumstances under which a proxy statement soliciting votes for the election of directors is actionable under Delaware law for material misstatements or omissions. Injunctive relief in the form of corrective disclosures and resolicitation may be appropriate if the matter is addressed in time by a court of equity. It is difficult to see how damages may also be available in such a case.[189]

Regardless of the matter on which stockholders are asked to vote, a stockholder plaintiff seeking compensatory damages for a material misstatement or omission must allege "some reasonable relationship between the alleged disclosure claims and harm suffered by individually by the shareholders."[190] Only compensatory damages that "arise logically and directly" may be awarded.[191]

The Plaintiffs' primary disclosure gripe is that the Board failed to disclose, or made inaccurate statements about, the ABA or the Base Price in various proxy statements. These proxy statements can be divided into three groups: (i) the 2009, 2011, and 2012 Proxy Statements; (ii) the 2009 Special Meeting Proxy Statement; and (iii) the 2010 Proxy Statement. The Court should grant the Defendants' Rule 12(b)(6) motion to dismiss unless (1) it is reasonably conceivable that the

---

[189] *See Loudon*, 700 A.2d at 146 (citations omitted).

[190] *Thornton*, 2009 WL 426179, at *5 (citing *In re J.P. Morgan Chase & Co.*, 906 A.2d at 773); *see also In re Orchard Enters., Inc.*, 88 A.3d at 53 (quoting *In re J.P. Morgan Chase & Co.*, 906 A.2d at 773) ("When seeking post-closing damages for breach of the duty of disclosure, however, the plaintiffs must prove quantifiable damages that are 'logically and reasonably related to the harm or injury for which compensation is being awarded.'").

[191] *See In re Tyson Foods, Inc.*, 919 A.2d at 602.

alleged misstatements or omissions were material to a reasonable Ebix stockholder in deciding how to vote and (2) the Court could grant the requested relief.

(i) The 2009, 2011, and 2012 Proxy Statements (Count II)

The 2009 Proxy Statement, issued in September 2009, allegedly did not disclose the ABA, which had been approved by the Outside Directors on July 15, 2009. The 2011 and 2012 Proxy Statements allegedly disclosed the incorrect ABA Base Price—$7.95 instead of $23.84. The Plaintiffs seek only damages for these purported disclosure violations.

It is reasonably conceivable that there is a substantial likelihood that a reasonable Ebix stockholder would have considered accurate information about the ABA and the Base Price important in deciding how to vote at the company's 2009, 2011, and 2012 annual meetings. But, those annual meetings have long since occurred, and those annual director terms—lasting from one election to the next— have long since expired. The Plaintiffs do not allege that any of the 2009, 2011, or 2012 elections has impeded their "rights to a share of economic profits or access to the shareholder process."[192] On these facts, there is no reasonable relationship between the alleged misstatements or omissions and damages.[193] The Plaintiffs have failed to allege or otherwise present a theory of damages that arise from these

---

[192] *In re Tyson Foods, Inc.*, 919 A.2d at 602.
[193] *See Thornton*, 2009 WL 426179, at *5.

purported disclosure violations.  Thus, there is no relief that the Court could grant for these claims.[194]

For this reason, these disclosure claims regarding the 2009, 2011, 2012 Proxy Statements are dismissed under Rule 12(b)(6).

(ii)  The 2009 Special Meeting Proxy Statement (Count II)

The Board allegedly failed to disclose the existence of the ABA in the 2009 Special Meeting Proxy Statement, which sought stockholder approval to increase the number of authorized shares.  The Board also did not disclose that the intended stock dividend would decrease the ABA's Base Price.  For these alleged omissions, the Plaintiffs again seek only compensatory damages.

It is not reasonably conceivable that information regarding the ABA would have been material to a stockholder's decision-making process about whether to vote for the proposed charter amendment.  The Court is unwilling to conclude, even at the motion to dismiss stage, that information about the ABA would have changed the total mix of information available.  Alternatively, the Plaintiffs again failed to articulate how damages logically flow from or reasonably relate to the harm they allegedly suffered because of these omissions.

---

[194] *See In re Tyson Foods, Inc.*, 919 A.2d at 602 ("Lacking any form of relief that might be granted, plaintiffs have failed to state a claim [for purported disclosure violations in a proxy statement regarding an election of directors.]").

Thus, this disclosure claim regarding the 2009 Special Meeting Proxy Statement must also be dismissed under Rule 12(b)(6).

(iii) The 2010 Proxy Statement (Counts II and IV)

The Board requested Ebix stockholder approval of the 2010 Plan in the 2010 Proxy Statement, in which the Board noted that the ABA's Base Price was $7.95. This disclosure was purportedly inaccurate because the Base Price at the time of the 2010 Proxy Statement was, as it still is today, $23.84. The relief requested by the Plaintiffs includes damages, a declaration that the 2010 Plan was not validly approved by Ebix stockholders, and rescission of the compensation received by the Board pursuant to the 2010 Plan.

Based on these allegations, the Court concludes that it is reasonably conceivable that the ABA Base Price was material to a reasonable Ebix stockholder in deciding whether to approve the 2010 Plan.

> Where shareholder ratification of a plan of option compensation is involved, the duty of disclosure is satisfied by the disclosure or fair summary of all of the relevant terms and conditions of the proposed plan of compensation, together with any material extrinsic fact within the board's knowledge bearing on the issue.[195]

The ABA, even if it is not subject to the 1996 Plan, was an incentive-based form of compensation granted to Raina, the Chairman and CEO. The 2010 Proxy Statement sought stockholder action on a substantially similar subject matter:

---

[195] *Lewis*, 699 A.2d at 333.

approval of an incentive-based compensation plan for Ebix officers, directors, and employees. Given the size of the ABA grant, it is reasonably conceivable that the difference in Base Price between $7.95 and $23.84 was material.[196]

Compensatory damages may be available for this allegedly material misstatement, such as (although the Court may be skeptical of this potential amount) for any individual harm distinct to Ebix stockholders related to the Board's failing to comply with NASDAQ rules regarding stockholder approval of the 2010 Plan. But, the Plaintiffs have requested more than compensatory damages; they also seek declaratory relief (*i.e.*, declaring that the Ebix stockholder approval of the 2010 Plan was invalid) and equitable relief (*i.e.*, rescinding the compensation received by the Board under the 2010 Plan). These requests for relief may be available because they logically flow from this claim: they all

---

[196] For example, in the abandoned Goldman merger at $20.00 per Ebix share, a $7.95 Base Price gave Raina rights to an approximately $84 million payment. Am. Compl. ¶¶ 8, 79. With a $23.84 Base Price, Raina would not have been entitled to any payment under the ABA.

Separately, that the alleged $23.84 Base Price would have been more favorable to stockholders than the disclosed $7.95 Base Price does not change the Court's conclusion.

> Withholding information from shareholders violates their rights even if it leads to them making the "right," and even highly profitable, result. To hold otherwise would be to state that a corporation may request consent from its shareholders, withhold relevant information, and only be liable for damages in those situations in which it appears *ex post* that the company has suffered financial damages. This cannot be, and is not, the law of Delaware.

*In re Tyson Foods, Inc.*, 919 A.2d at 602.

reasonably relate to the Board's alleged failure to obtain fully informed stockholder approval of the 2010 Plan.[197]

Accordingly, the Plaintiffs have sufficiently pled a material disclosure claim regarding the 2010 Proxy Statement and the 2010 Plan.

2. The Derivative Claim Regarding the Board's Receiving Compensation Under the 2010 Plan (Count V)

The stock exchange on which Ebix stock is listed, NASDAQ, allegedly requires stockholder approval of the 2010 Plan.[198]  It is not alleged that the Outside Directors received options (or that Raina received restricted stock) that violated the 2010 Plan. Nor do the Plaintiffs allege, for example, that the Board intentionally or knowingly misled Ebix stockholders in the 2010 Proxy Statement or even that the Board received this compensation with the knowledge that the NASQAQ-required vote was materially uninformed or possibly invalid.  Rather, the theory of liability here is that the Board members breached their fiduciary duties by receiving compensation pursuant to the 2010 Plan that was not validly approved by Ebix stockholders.

It is plain that, were the Ebix stockholder approval (and thus ratification) of the 2010 Plan valid—in other words, were the 2010 Proxy Statement not materially

---

[197] *See Thornton*, 2009 WL 426179, at *5; *In re Tyson Foods, Inc.*, 919 A.2d at 602.

[198] The parties did not present, and the Court is unaware of, any requirement under Delaware law that stockholders must approve a corporation's incentive-based, compensation plan for officers, directors, and employees.

misleading—then the grants of options to the Outside Directors (or restricted shares to Raina) under the 2010 Plan would be analyzed under the deferential business judgment standard of review.[199] But, again, that is not what is alleged. Under the Plaintiffs' theory, there was no valid Ebix stockholder approval or ratification. As the Court previously concluded, it is reasonably conceivable, at the pleadings stage, that stockholder approval of the 2010 Plan may not have been valid due to material misstatements in the 2010 Proxy Statement regarding the ABA Base Price. Accordingly, the Plaintiffs have rebutted the business judgment standard of review of the fairness of these compensation awards. As the Delaware Supreme Court has observed, "[l]ike any other interested transaction, directoral self-compensation decisions lie outside the business judgment rule's presumptive protection, so that, where properly challenged, the receipt of self-determined

---

[199] *See, e.g.*, *Bosnjak*, 2014 WL 2930869, at *9 ("Because plaintiff has failed to undermine the validity of the stockholder approvals on which the equity awards in question were expressly conditioned, the business judgment rule applies to the board's decision to grant those awards in the first instance."); *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007) ("[I]n a situation where directors are expressly permitted under the terms of a stockholder-approved option plan to issue below-market options, it would be well within the realm of business judgment to choose to issue all options to a set of similarly-situated employees at a uniform strike price reflecting the stock's low point for the quarter."); *Criden v. Steinberg*, 2000 WL 354390, at *4 (Del. Ch. Mar. 23, 2000) ("Carrying out a predetermined stock option plan, approved by shareholders, entirely consistently with the plan can hardly be characterized as an act of a 'disloyal' fiduciary."); *In re 3COM Corp.*, 1999 WL 1009210, at *1 (Del. Ch. Oct. 25, 1999) ("Decisions of directors who administer a stockholder approved director stock option plan are entitled to the protection of the business judgment rule, and, in the absence of waste, a total failure of consideration, they do not breach their duty of loyalty by acting consistently with the terms of the stockholder approved plan.").

benefits is subject to an affirmative showing that the compensation arrangements are fair to the corporation."[200]

Thus, the Defendants' motion to dismiss this derivative claim under Rule 12(b)(6) is denied.

## G. *Exculpation from Monetary Liability for the Board under Ebix's Charter*

### 1. The Direct Disclosure Claim (Count II and IV)

The requirement for directors to disclose accurately all material information when seeking stockholder approval is a specific application[201] of the standard of conduct—due care and loyalty—demanded of directors under Delaware law.[202] Breaches of the duty of disclosure are within the reach of a corporation's exculpatory charter provision adopted pursuant to 8 *Del. C.* § 102(b)(7). A Section 102(b)(7) charter provision, such as that in Ebix's charter,[203] may

---

[200] *Telxon Corp. v. Meyerson*, 802 A.2d 257, 265 (Del. 2002).

[201] *See Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001) ("[T]he board's fiduciary duty of disclosure . . . is not an independent dut[y] but the application in a specific context of the board's fiduciary duties of care, good faith, and loyalty.").

[202] *See Malone*, 722 A.2d at 10; *see also Chen v. Howard-Anderson*, 87 A.3d 648, 666 (Del. Ch. 2014) (discussing the distinction in Delaware jurisprudence between the standard of conduct required of directors as fiduciaries and the Court's standards of review of the conduct of directors); *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35-36 (Del. Ch. 2013) (same).

[203] Ebix's charter provides, in relevant part:

> A director shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director; provided that this sentence shall not eliminate or limit the liability of a director (i) for any breach of his duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, (iii) under Section 174 of the General Corporation Law, or (iv) for any transaction from which the director derives an improper personal benefit.

exculpate directors from personal liability for a number of claims.[204]  Even under the broadest Section 102(b)(7) provision permitted under Delaware law, however, directors are still personally liable for damages from breaches of the duty of loyalty or bad faith conduct.[205]

Because "not every breach of the duty of disclosure implicates bad faith or disloyalty," it is possible that directors may be exculpated from monetary liability for an alleged disclosure violation.[206]  The Court may apply Ebix's Section 102(b)(7) provision at the pleadings stage, and thereby dismiss any claim for damages against the Board for material misstatements in the 2010 Proxy Statement, only if it is not reasonably conceivable that the failure to disclose the information at issue was more than a breach of the duty of care.[207]  Conversely, if it is reasonably conceivable that the disclosure violations were due to a breach of the duty of loyalty or bad faith, then the Court cannot exculpate the Board from

---

Lyons Trans. Aff. Ex. 3 (Ebix Certificate of Incorporation, Art. XI).  Ebix's charter is extrinsic to the Amended Complaint.  The Court may nonetheless consider the charter at the pleadings stage because it is subject to judicial notice and because the Plaintiffs do not contest its existence or authenticity.  *See Malpiede*, 780 A.2d at 1090-92.

[204] *See, e.g.*, *Malpiede*, 780 A.2d at 1094-96 (endorsing the application of a corporation's Section 102(b)(7) charter provision to exculpate breach of fiduciary duty claims at the pleadings stage).

[205] *See, e.g.*, *Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *15 (Del. Ch. May 7, 2014) (recognizing the outer limits of a Section 102(b)(7) provision that provided for exculpation of personal liability for directors "to the fullest extent permitted" under Delaware law).

[206] *In re Transkaryotic Therapies, Inc.*, 954 A.2d at 362-63.

[207] *See In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 676 (Del. Ch. 2013) (dismissing breach of fiduciary duty claims seeking monetary damages against directors where the allegations did not support a reasonable inference of a breach of the duty of loyalty or bad faith conduct).

liability at this time. On several occasions, this Court has identified the difficulty in divining an exclusive duty of care breach from a possible duty of loyalty breach or bad faith conduct on a Rule 12(b)(6) motion to dismiss a disclosure claim.[208]

The present claim, however, is not one of those situations. For this breach of fiduciary duty claim to survive the Defendants' Rule 12(b)(6) motion in light of Ebix's Section 102(b)(7) provision, the Plaintiffs need to allege conduct "implicating bad faith or a breach of the duty of loyalty" for "at least half of the directors who approved the decision at issue"[209]—meaning at least three members of the Board, who all approved the 2010 Proxy Statement. To challenge whether a particular director acted loyally, the Plaintiffs need to allege that the director was interested, not independent, or not acting in good faith.[210]

The Plaintiffs failed to plead that, other than possibly Raina,[211] any member of the Board who approved the 2010 Proxy Statement was interested, not

---

[208] *See, e.g.*, *In re Tyson Foods, Inc.*, 919 A.2d at 598 ("It is too early for me to conclude that the alleged failures to disclose do not implicate the duty of loyalty."); *see also Orman*, 794 A.2d at 41 ("Unfortunately for the defendants, however, because Orman has pled facts which make it reasonable to question the independence and disinterest of a majority of the Board that decided what information to include in the Proxy Statement, I cannot say, as a matter of law, that the complaint unambiguously states only a duty of care claim.").

[209] *Hamilton P'rs*, 2014 WL 1813340, at *15 (citing *Cinerama, Inc.*, 663 A.2d at 1168); *see also Emerald P'rs v. Berlin*, 787 A.2d 85, 92 (Del. 2001) (citing *Malpiede*, 780 A.2d at 1094) ("The effect of our holding in *Malpiede* is that, in actions against the directors of Delaware corporations with a Section 102(b)(7) charter provision, a shareholder's complaint must allege well-pled facts that, if true, implicate breaches of loyalty or good faith.").

[210] *See In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *7 (Del. Ch. Oct. 13, 2011).

[211] Again, for purposes of this analysis, the Court assumes, without deciding, that Raina may be deemed interested in the material misstatements in the 2010 Proxy Statements as the counterparty to the ABA.

independent, or not acting in good faith by failing to disclose the correct ABA Base Price. It is not reasonably conceivable that the five Outside Directors stood on both sides of the ABA or that the ABA either provided them with a material benefit or caused them to suffer a material detriment.[212] It is likewise not reasonably conceivable that the Outside Directors were beholden to another's interest or that Raina knew about the inaccuracy and failed to disclose that information to the Outside Directors.[213] Finally, it is not reasonably conceivable that the Outside Directors failed to act in good faith by, for instance, knowingly disclosing an incorrect ABA Base Price.[214] The basic premise underlying the Plaintiffs' theory here is precisely the opposite: the Board did not know about this potential issue with the ABA Base Price—at least not before this lawsuit.

Because the 2010 Proxy Statement disclosure violations do not implicate loyalty or bad faith, the Court may apply Ebix's Section 102(b)(7) charter provision. Therefore, the Board is exculpated for monetary damages for this

---

[212] *See Orman*, 794 A.2d at 23.

[213] *See Rales*, 634 A.2d at 936; *Aronson*, 473 A.2d at 815; *see also In re Transkaryotic Therapies*, 954 A.2d at 363.

[214] *See In re Walt Disney Co.*, 906 A.2d at 67 (noting that bad faith under Delaware law includes "where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties").

disclosure claim, but the possibility of awarding the requested declaratory and equitable relief remains.[215]

## 2.  The Derivative Fiduciary Duty Claim (Count V)

The Court previously concluded that demand is excused for the derivative breach of fiduciary duty claim regarding the Board's receipt of options or restricted shares under the 2010 Plan because at least half the Board is interested.  That the Board is interested for purposes of Rule 23.1 implicates a breach of the duty of loyalty for purposes of Section 102(b)(7).[216]  Thus, to the extent that the Plaintiffs seek compensatory damages that reasonably relate to this claim, the Board is not presently exculpated from liability pursuant to Ebix's Section 102(b)(7) charter provision.

## V.  CONCLUSION

The Defendants' motion to dismiss under Rules 23.1 and 12(b)(6) is denied as to: (i) Counts II and IV asserted against the Board to the extent the Plaintiffs seek non-monetary relief for material misstatements related to the ABA Base Price in the 2010 Proxy Statement; (ii) Count II asserted against the Board challenging the continued existence of the ABA as an unreasonable anti-takeover device; and

---

[215] *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 542 (Del. 1996) ("While section 102(b)(7) and charter provisions adopted thereunder will leave stockholders without a monetary remedy in some instances, they remain protected by the availability of injunctive relief. Stockholders are not discouraged from pursuing such remedies when warranted.").

[216] *See OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 723-24 (Del. Ch. 2014).

(iii) Count V asserted against the Board regarding the compensation they received under the 2010 Plan. The Plaintiffs' other claims are dismissed for the reasons set forth above.

The Court requests counsel to confer and to submit an implementing form of order.